**CASE BEING CONSIDERED FOR TREATMENT**
**PURSUANT TO RULE 34(J) OF THE COURT'S RULES**
**NO. 13-1064**

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# ERIC STROHMEYER,

*Petitioner,*

**v.**

# SURFACE TRANSPORTATION BOARD;
# UNITED STATES OF AMERICA,

*Respondents.*

## ON PETITION FOR REVIEW OF AN ORDER OF
## THE SURFACE TRANSPORTATION BOARD

——————————

**BRIEF OF INTERVENOR**
**SAN LUIS AND RIO GRANDE RAILWAY COMPANY**
**IN SUPPORT OF RESPONDENTS**

——————————

John D. Heffner
STRASBURG & PRICE, LLP
1700 K Street, NW, Suite 640
Washington, DC 20006
(202) 742-8607

*Counsel for Intervenor San Luis and*
*Rio Grande Railway Company*                *Dated: November 25, 2013*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties

The Petitioner is Eric Strohmeyer (Strohmeyer or Petitioner).  He and James Riffin (Riffin), intervenor in support of Petitioner, applied to the Surface Transportation Board  (Board) under the Board's streamlined Notice of Exemption Procedures to become rail carriers in an unusual transaction which the Board determined was not appropriate for streamlined licensing and should be examined in a regular licensing proceeding.

The Board and the United States of America are the Respondents. Intervenors in support of Respondents – the City of Creede, Colorado; Mineral County, Colorado; Elk Creek Ranch; Wason Ranch; and San Luis & Rio Grande Railway – appeared before the Board to oppose the notice of exemption filed by Riffin and Strohmeyer.  Intervenor 4UR Ranch, which also supports the Respondents, did not appear before the Board.

The Town of South Fork, Colorado and two individuals – Libby Albritton and Vance Sparks – opposed the exemption before the Board, but are not parties to this appeal.

### B.     Ruling under Review

Riffin and Strohmeyer challenge the Board's decision in FD 35705, *James Riffin and Eric Strohmeyer – Acquisition Exemption-In Rio Grande and Mineral*

i

*Counties, Colo.,* served January 11, 2013, reproduced in the "Joint Appendix" at JA 5-8.

### C. Related Cases

In *Riffin v. STB*, No. 11-1480 (D.C. Cir.), argued September 13, 2013, Riffin challenges the Board's authority to decide that a proposed common carrier freight railroad may not exclude "Toxic Inhalation Hazards" (TIH)[1] from the commodities it is required to transport upon reasonable request as part of its common carrier obligation under 49 U.S.C. §11101(a). The obligation to carry TIH also is at issue in this case. On October 25, 2013, the Court upheld the Board's ruling as a reasonable interpretation of the law.

---

[1] Toxic Inhalation Hazards, sometimes referred to as toxic by inhalation hazards, are chemical gases and volatile chemical liquids defined by the Department of Transportation that are hazardous when inhaled. TIH products include chlorine, used to purify drinking water, and anhydrous ammonia and to manufacture fertilizer.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1, Intervenor in support of Respondents is the San Luis & Rio Grande Railway.  San Luis & Rio Grande Railway and its parent companies, Iowa Pacific Holdings, LLC, and Permian Basin Railways, do not have any publicly traded stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

TABLE OF AUTHORITIES FOR STATUTORY ADDENDUM ....................... vii

GLOSSARY.................................................................................... viii

JURISDICTIONAL STATEMENT .........................................................1

ISSUE PRESENTED FOR REVIEW ......................................................1

STATUTES AND REGULATIONS ........................................................1

I.     STATEMENT OF THE CASE ......................................................2

II.    STATEMENT OF THE FACTS ....................................................2

III.   SUMMARY OF ARGUMENT......................................................7

IV.    ARGUMENT...........................................................................8

       1.    Financial Qualifications .....................................................9

       2.    Commodity Limited Trackage Rights................................11

       3.    Petitioners' Proposal Is Controversial...............................12

       4.    Petitioners' Proposal Does Not Qualify for an Exemption.................13

V.     CONCLUSION.......................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## AGENCY DECISIONS

*ABC & D Recyclying, Inc. – Lease & Operation Exemption – Line of R.R. in Ware, Mass., FD 35397, STB served Jan. 20, 2011.....................................7, 9

Denver & Rio Grande Railway Historical Foundation, d/b/a Denver & Rio Grande Railroad, L.L.C.-Petition for Declaratory Order, FD 35496, STB served Feb. 23, 2012 ...............................................................3, 11

*Eighteen Thirty Group, LLC—Acquis. Exemption—in Allegany Cnty., Md., FD 35438, STB served April 5, 2012 ................................9

*FPN USA, Inc. – Operation Exemption – Tijuana-Tecate Shortline, FD 35155, STB served Aug. 8, 2008....................................7, 9

Permian Basin Rys. – Acq. of Control Exemp. – S. L. & R. G. Ry., FD 34799, STB served Dec. 23, 2005 ..................................3

*Pro-Go Corp. – Operation Exemption – in Suffolk Cnty, N.Y., FD 35120, STB served Mar. 13, 2008 ...................................7, 9

*Saratoga & North Creek Railway, LLC—Operation Exemption-Tahawus Line, FD 35559, STB served Nov. 23, 2011 (initial decision), STB served May 14, 2012 (reconsideration decision) ................................12

S. L. & R. G. Ry. – Acq. & Op. Exemp. – U. P. R.R., FD 34350, STB served July 18, 2003 .....................................................3

*Winamac S. Ry. Co. – Trackage Rights Exempton – A.&R.Line, Inc., FD 35208, STB served Jan. 9, 2009 ................................7, 9

U.P.R.R – Aband. Exemp. – in Rio Grande and Mineral Counties, CO, AB-33 (sub-no. 132X), STB served May 11, 1999...............................4

*Chief Authorities are Designated by an Asterisk*

**STATUTES**

49 U.S.C. § 10101 *et seq.*................................................................6

49 U.S.C. § 10502................................................................7, 13

49 U.S.C. § 10901................................................................7

49 U.S.C. § 10904................................................................4

**REGULATIONS**

49 CFR pt. 1201 ................................................................1, 2

49 CFR § 1150.31 ................................................................5

## <u>TABLE OF AUTHORITIES FOR STATUTORY ADDENDUM</u>

The following regulatory authority has been supplied in an addendum bound with the brief.

**Regulations**                                   **Addendum Page**

49 CFR Part § 1201                                Add. 1

# <u>GLOSSARY</u>

San Luis & Rio Grande Railway adopts the Glossary of the Respondents, the

Surface Transportation Board and the United States of America but adds the

following additional terms

| | |
|---|---|
| ICCTA | I.C.C. Termination Act |
| NOE | A notice of exemption or class exemption, here under 49 CFR 1150.31 |
| Short line railroad | A class III railroad as defined in 49 CFR Part 1201, typically a railroad with under $20 million in annual operating revenues |

## JURISDICTIONAL STATEMENT

Intervenor San Luis & Rio Grande Railway, the City of Creede, CO, Mineral County, CO, Elk Creek Ranch, and Wason Ranch Corporation, subscribe to the jurisdictional statement set forth in the joint brief of the Respondents, the Surface Transportation Board and the United States of America.

## ISSUE PRESENTED FOR REVIEW

Intervenors San Luis & Rio Grande Railway, the City of Creede, CO, Elk Creek Ranch, and Wason Ranch Corporation, subscribe to the statement of issues presented in the joint brief of the Respondents, the Surface Transportation Board and the United States of America.

## STATUTES AND REGULATIONS

49 C.F.R. Part 1201 is set forth in the Addendum to this Brief.  All other relevant statutes and regulations are set forth in the Addendum to Respondents' Brief.

1

# I.

## STATEMENT OF THE CASE

This proceeding involves the petition for review by Eric Strohmeyer and James Riffin (hereafter identified as "the Petitioners")[1] of a decision by the Surface Transportation Board dated Jan. 11, 2013, rejecting a verified notice of exemption ("NOE") they jointly filed for local trackage rights over and operation on a seven mile-long portion of a line of railroad in Colorado. J.A. 5-9. The subject trackage is part of a 20 mile-long line owned by the Denver & Rio Grande Railway Historical Foundation ("DRGRHF"). J.A. 58. Intervenor San Luis & Rio Grande Railway submits this brief in support of the Respondents.

# II.

## STATEMENT OF THE FACTS

San Luis & Rio Grande Railway Company ("SLRG"), is a Class III short line railroad[2] with which Petitioners' proposed operation would connect. J.A. 26. Originally established in 2003, SLRG acquired a 149 mile railroad branch line from the Union Pacific Railroad Company ("UP") in southern Colorado that

---

[1]    While Mr. Strohmeyer is the only one filing a Petition for Review, Mr. Riffin has intervened in support of Mr. Strohmeyer. Both individuals sought the trackage rights exemption that is the subject of this proceeding. Accordingly, SLRG is treating both of them as Petitioners.

[2]    The STB's regulations classify railroads according to their annual operating revenues. As pertinent here, Class III railroads are the smallest category of railroads, those having operating revenues of under $20 million as adjusted for inflation. 49 CFR Part 1201.

(1) links Walsenburg with Derrick (also known as South Fork)[3] via Alamosa and

(2) connects Alamosa with Antonito.[4]  Id.  SLRG's present owner is Iowa Pacific

Holdings, LLC, a short line railroad holding company which purchased the

company from its former owner, short line holding company RailAmerica, Inc., in

January 2006.[5]  SLRG has continuously provided a common carrier freight service

as well as an excursion passenger railroad service over the line, connecting and

interchanging traffic with both UP and BNSF Railway Company at Walsenburg.

Id.

    The court will take judicial notice of the fact that the City of Monte Vista

("Monte Vista") is a political subdivision located in south central Colorado along

SLRG's right of way.  It is located about 30 miles east of South Fork and the

eastern-most portion of the DRGRHF rail line over which Petitioners seek trackage

rights.  See also J.A.  16.  It is currently engaged in litigation with DRGRHF and

its individual owner Donald Shank in both the Colorado court system and the

Board challenging their preemption claims.[6]

---

[3]     Derrick will be referred to as South Fork for simplicity's sake.

[4]     *See S. L. & R. G. Ry. – Acq. & Op. Exemp. – U. P. R.R.*, FD 34350, STB
served July 18, 2003.

[5]     *See Permian Basin Rys. – Acq. of Control Exemp. – S. L. & R. G. Ry.*, FD
34799, STB served Dec. 23, 2005.

[6]     *Donald H. Shank v. Respondent, Town of Monte Vista*, District Court, Rio
Grande County, Colorado, Case #2011CV29 and *Denver & Rio Grande Railway
Historical Foundation, d/b/a Denver & Rio Grande Railroad, L.L.C.-Petition for
Declaratory Order*, FD 35496.

3

DRGRHF is a Class III railroad and not-for-profit corporation established in 1999 by Donald Shank, to acquire a 21.6 mile long branch line between South Fork and Creede that UP sought and obtained authority to abandon.[7]  J.A. 26. DRGRHF is not a party to this proceeding.  DRGRHF's line represents the western-most extension of SLRG's line beyond South Fork.  Id.  While DRGRHF's line physically connects with SLRG's line at South Fork, these companies have never executed an interchange agreement and have never interchanged any common carrier traffic.  Although DRGRHF holds common carrier authority for its line of railroad, it has never provided any interstate common carrier freight or passenger service in its more than 13 year existence. J.A. 26-7, 34, 59 and 63.  DRGRHF is the very same company that filed a petition with the Board on July 12, 2011, for a declaratory ruling that certain facilities DRGRHF owns at Monte Vista, CO, adjacent to SLRG's rail line, should be preempted from Monte Vista's land use and zoning ordinances because of their purported use for common-carrier railroad purposes.  Monte Vista and SLRG also oppose that petition which is still pending before the Board.  J.A. 27.

The proceeding leading to this appeal began on December 13, 2012, shortly before the onset of the Christmas-New Year's Holiday period, when Petitioners

---

[7]    DRGRHF purchased that rail line through an offer of financial assistance ("OFA") under 49 U.S.C. §10904.  *See U. P. R.R. – Aband. Exemp. – in Rio Grande and Mineral Counties, CO*, AB-33 (Sub-no. 132X), STB served May 11, 1999.

jointly filed an NOE invoking the class exemption set forth at 49 CFR §1150.31

("the class exemption"). J.A. 12. Petitioners sought to acquire "nonexclusive

local commodity specific trackage rights" over approximately 7 miles of railroad

owned by DRGRHF between MP 299.30 near South Fork, CO, and ending before

the first trestle at MP 306.38. Id. Petitioners submitted very limited information

about the purpose of their proposed trackage rights acquisition, other than to state

that they would not transport any toxic by inhalation ("TIH") commodities. J.A.

13, 29. Nor did they indicate what traffic their operation might handle, the identity

of the proposed customers, traffic volumes, and the service required, or even

whether government approvals under local zoning, land use, or environmental

regulations were needed. This is important because no such customers currently

exist and facilities would have to be constructed by any future customers to handle

their traffic. J.A. 29. Intervenor subscribes to statements made by Respondents in

their brief regarding the Petitioners' qualifications (or lack thereof) to enter the

railroad business and past attempts to obtain Board authority to acquire or operate

railroads. Neither of the Petitioners is, owns, or operates a railroad or appears to

have any experience with railroad ownership, operations, or management.

　　　　After SLRG filed a reply and opposition comments on January 2, 2013, and

the City of Creede, CO, Mineral County, Elk Ranch, Wason Ranch Corporation,

two local home owners, and the Town of South Fork filed in opposition, Riffin

sought leave to file an amended NOE, among other documents.  J.A. 42-52, 72-112.  Again these filings failed to provide more information about the nature of the proposed rail service, the traffic, or the customers to be served.

 Briefly, SLRG asked the Board to dismiss Petitioners' NOE as deficient under its regulations, questioned the legal ability of DRGRHF to grant common-carrier "trackage rights" over the subject rail line, and asserted that the proposal was controversial and not suitable for handling under the expedited class exemption procedures.  J.A. 30-32.  Moreover, SLRG asserted that petitioners' proposal failed to satisfy the statutory standard under the ICC Termination Act ("ICCTA")[8] for the grant of an exemption from the railroad licensing provisions of the Act.  J.A. 33.  In support of its protest, SLRG submitted written testimony from its president Edwin Ellis indicating that neither it nor the UP had any agreement with Petitioners for interchange of freight[9] and that any potential coal movement using the trackage rights over DRGRHF is economically and operationally infeasible. Mr. Ellis noted the lack of sufficient room to construct interchange facilities between DRGRHF and SLRG at South Fork.  Finally, Mr. Ellis observed that Petitioners have not sought any building or environmental permits from local

---

[8]     49 U.S.C. §10101 *et seq.*

[9]     Union Pacific, one of SLRG's two connecting carriers, also filed comments with the Board stating that it had no agreement for interchange with DRGRHF. J.A. 18, 40.

authorities for construction of truck-to-rail transfer facilities and that such

permitting typically entails lengthy approval times.  J.A. 38-40.

On January 11, 2012, the Board issued its decision rejecting Petitioners'

NOE as novel, unusual, and controversial.  J.A. 5-9.  Accordingly, and in view of

the limited information provided about their proposal, the Board directed

Petitioners to file a full application should they desire to pursue authorization.  J.A.

8.

### III.

### SUMMARY OF ARGUMENT

The Board has a long and consistent history of requiring applicants such as

the Petitioners here seeking its authorization for railroad transactions that are

novel, unusual, or controversial to submit information beyond that required in an

NOE.  In the case of a short line railroad start up, it could do so by requiring the

applicant to submit an individual petition for exemption under 49 U.S.C. §10502

from the provisions of §10901 or through a formal application for a certificate of

public convenience and necessity under §10901.[10]

---

[10]    *See, e.g., ABC & D Recycling, Inc.—Lease & Operation Exemption—Line of R.R. in Ware, Mass.*, FD 35397, STB served Jan. 20, 2011; *FPN USA, Inc.—Operation Exemption—Tijuana-Tecate Shortline*, FD 35155, STB served Aug. 8, 2008; *Pro-Go Corp.—Operation Exemption—in Suffolk Cnty., N.Y.*, FD 35120, STB served Mar. 13, 2008; *Winamac S. Ry. Co.—Trackage Rights Exemption—A. & R. Line, Inc.*, FD 35208, STB served Jan. 9, 2009.

SLRG is particularly sensitive to and affected by these concerns as it is the sole connection between DRGRHF and Petitioners' proposed trackage rights service over it and the national rail network at Walsenburg, CO. Any traffic moving off DRGRHF's line that Petitioners might generate would necessarily have to cross SLRG's railroad. J.A. 30. SLRG has great cause to worry because of Petitioners' poor financial condition, apparent lack of railroad operating expertise, inadequate information about its proposed operation and traffic, and the unsuitable condition of Petitioners' host railroad's, DRGRHF's, track and equipment. J.A. 30, 33-5. SLRG worries that it might be stuck with any liabilities arising from traffic or trains generated by or moving to Petitioners' proposed service. Accordingly, the Board acted properly in rejecting Petitioners' NOE and requiring the filing of a full application.

## IV.

## ARGUMENT

As best that SLRG can fathom, Petitioners challenge the Board's January 11, 2013, ruling on four grounds relevant to SLRG's interest: it was arbitrary, capricious, unreasonable, and/or unlawful for the Board to (1) require Petitioners to provide financial information in an NOE proceeding for trackage rights; 2) find that an NOE limiting trackage rights to specific commodities was a "novel legal question"; 3) find that this proceeding was "controversial" and therefore ineligible

8

to use the "class exemption;" and 4) find that their proposal did not qualify for approval under the ICCTA's exemption provisions.  Petitioners are wrong on all accounts.

### 1.    Financial Qualifications

As the Board has amply addressed in its brief, the agency has a long and consistent body of law addressing the issue of when and under what circumstances it will require an applicant seeking regulatory authority to provide more than the basic level of information required by the regulations to support its request. *See, e.g., ABC & D Recycling, Inc.—Lease & Operation Exemption—Line of R.R. in Ware, Mass.*, FD 35397, STB served Jan. 20, 2011; *FPN USA, Inc.—Operation Exemption—Tijuana-Tecate Shortline*, FD 35155, STB served Aug. 8, 2008; *Pro-Go Corp.—Operation Exemption—in Suffolk Cnty., N.Y.*, FD 35120, STB served Mar. 13, 2008; *Winamac S. Ry. Co.—Trackage Rights Exemption—A. & R. Line, Inc.*, FD 35208, STB served Jan. 9, 2009.  Here the Board has good reason to request additional information in view of Mr. Riffin's documented history of seeking bankruptcy protection, conflicting financial representations, and his "stewardship" (or lack thereof) during the years he owned a short rail line in Allegany County, MD.[11]  J.A. 27-29, 33-35.

---

[11]      *See, Eighteen Thirty Group, LLC—Acquis. Exemption—in Allegany Cnty., Md.* FD 35438,  *et al.*, STB served April 5, 2012 (cited as *1830 Group*), and cases cited and discussed therein.

SLRG has standing to participate in this proceeding because it is the sole connecting carrier between Petitioners' proposed railroad and UP and would be adversely affected by Petitioners' proposed service. J.A. 30. SLRG is particularly concerned about Petitioners' financial "fitness" and believes the Board needs a proceeding to develop this issue more thoroughly before it can approve the proposed trackage rights request. More specifically, Petitioners' apparent poor financial condition leads SLRG to fear that they lack or could not obtain adequate insurance coverage and lack sufficient assets to indemnify SLRG in the event of an accident involving traffic interchanged between Petitioners and SLRG. The recent and tragic accident at Lac Megantic, Quebec, demonstrates that SLRG's fears have a rational basis. It may well be that claimants and government hold Canadian Pacific Railway and other parties not directly connected with that accident liable for the acts of the carrier actually involved.

Here an interchange agreement (and there is none) would theoretically allocate liability between the parties including SLRG and UP. J.A. 18, 30, 40, 63. But as a practical matter, any injured party would look to recover from the party with the deeper pockets and that could include SLRG. Although Petitioners' potential traffic might not include TIH, the fact is that the portion of the rail line that SLRG owns runs along a river through an environmentally sensitive area. J.A. 57. Accordingly, a derailment due to defective or improperly loaded or inspected

equipment resulting in cargo or rail cars winding up in the adjacent river could entail very expensive environmental clean-up costs for which SLRG might be liable. Simply stated, SLRG needs the Board to investigate Petitioners' financial ability to own and operate a railroad so that SLRG need not worry about a liability that could bankrupt it and terminate rail service for its customers.

> 2.    Commodity Limited Trackage Rights

Petitioners would have the Court believe that the commodity limitations in the proposed trackage rights do not present any basis for Board rejection of their request. While Petitioners cite numerous decisions involving the grant of "commodity limited" trackage rights, there is a fatal flaw in their reasoning. What Petitioners failed to explain or perhaps even understand is that in each of these cases the carrier granting the rights ("the host carrier") had the ability to and did transport freight of all kinds. But here, as the evidence of record shows,[12] the host carrier, the DRGRHF, lacks both the railroad infrastructure and the equipment to handle freight of all types on its own railroad. It is strictly a tourist operation physically incapable of handling heavy trains. DRGRHF could not transport "freight all kinds" which is the prerequisite for granting "commodity limited

---

[12]     SLRG and Monte Vista presented substantial evidence in the DRGRHF preemption case including photographs that showed that DRGRHF does not operate and cannot handle full size railroad equipment on its line. *See, Denver & Rio Grande Railway Historical Foundation, d/b/a Denver & Rio Grande Railroad, L.L.C.-Petition for Declaratory Order*, FD 35496, cited in footnote 7 at page 3.

trackage rights." J.A. 33, 59. Accordingly, the Board was right to conclude that the narrow trackage rights request presented a novel question with far reaching implications that could only be explored in a formal application proceeding.

### 3.     Petitioners' Proposal Is Controversial

Again, Petitioners want the Court to believe that the Board acted arbitrarily and capriciously in rejecting Petitioners' NOE as too controversial to qualify for the class exemption citing the agency's decision in *Saratoga & North Creek Railway, LLC—Operation Exemption—Tahawus Line*,  FD 35559, STB served May 14, 2012, slip op. at 7, involving another IPH short line subsidiary.  But that case is highly distinguishable.

There a senior level Board employee acting on the eve of Thanksgiving rejected the carrier's NOE as being too controversial to warrant authorization through a class exemption.[13]  In so doing, she acted on the basis of unverified and questionable information from a New York State environmental advocacy group. The Board in a second decision concluded that Saratoga had justified a need for the service after it filed a reconsideration request supported by numerous state and local government officials, members of Congress, rail shippers, local economic development agencies, and local citizens.  On reconsideration, the Board stated:

---

[13]     *Saratoga & North Creek Railway, LLC—Operation Exemption—Tahawus Line*, FD 35559, initial decision, STB served November 23, 2011.

"While we find that, in the November Decision, the Director properly

determined that Saratoga's notice of exemption presented issues that could

not be adequately decided under the limited class exemption procedures,

Saratoga and others have now provided adequate information for the Board

to determine that use of the class exemption to operate over the Tahawus

Line would be appropriate."

Saratoga re-filed a new NOE which the Board promptly granted over the continued

protest of certain environmental groups.  These cases are not comparable.  No

government agencies, shippers, economic development officials, or ordinary

citizens have come forth to extol the virtues and need for Petitioners' service.

Even Petitioners' co-conspirator Donald Shank remains silent.

> 4.     Petitioners' Proposal Does Not Qualify for an Exemption

Finally, SLRG urges that the Board acted properly in exercising its

discretion to find that Petitioners' proposal did not warrant approval under the

exemption provisions of the ICCTA, 49 U.S.C. §10502.  While SLRG believes that

the Respondents have covered this issue adequately, it merely notes Mr. Riffin's

history with owning (but not rehabilitating and never operating) the Allegany rail

line speaks volumes as to whether Petitioners' NOE would satisfy any of the rail

transportation policy goals of the ICCTA.[14]  By contrast, SLRG's sister railroad,

---

[14]     *See, 1830 Group, supra*, cited in footnote 12 on page 9.

Saratoga & North Creek Railway, took less than a year to restore to operation a former Delaware & Hudson Railway line where portions had been out of service from less than 10 to over 23 years. The Court can take judicial notice of the fact that line today is handling revenue freight as well as passengers connecting to or from Amtrak at Saratoga.

## V.

## CONCLUSION

The Board acted properly and in accordance with long established agency precedent in rejecting Petitioners' NOE and requiring the filing of a full application.  The Petition for Review should be denied.

Respectfully submitted,

/s/ John D. Heffner
JOHN D. HEFFNER
Strasburger & Price, LLP
1700 K Street, NW
Suite 640
Washington, D.C.  20006
202-742-8607

Due:  November 25, 2013

14

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*3,065*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [    ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [    ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].

Dated: November 25, 2013                  /s/ John D. Heffner
                                          *Counsel for Intervenor San Luis and
                                          Rio Grande Railway Company*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of November 2013, I caused this

Intervenor San Luis and Rio Grande Railway Company Brief in Support of

Respondents to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

Jeffrey D. Komarow
Craig M. Keats
Raymond A. Atkins
OFFICE OF GENERAL COUNSEL
395 E Street, SW
Washington, D.C.  20423
(202) 245-0260

*Counsel for Respondent Surface Transportation Board*

William Baer
Robert B. Nicholson
Adam B. Chandler
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 514-2413

*Counsel for Respondent United States of America*

Eric Strohmeyer
13 Century Lane
Watchung, New Jersey  07069
(908) 361-2435

*Pro Se Attorney*

James Riffin
1941 Greenspring Drive
Timonium, Maryland  21093
(443) 414-6210

*Intervenor James Riffin for Petitioner*

Ronald M. Johnson
Jacqueline M. Holmes
JONES DAY
51 Louisiana Avenue, NW
Washington DC  20001
(202) 879-3939

*Intervenor 4UR Ranch, City of Creede, Colorado and*
  *Elk Creek Ranch for Respondent*

I further certify that on this 25th day of November, 2013, I caused the

required copies of the Intervenor San Luis and Rio Grande Railway Company

Brief in Support of Respondents to be hand filed with the Clerk of the Court.

/s/ John D. Heffner
*Counsel for Intervenor San Luis and*
  *Rio Grande Railway Company*

# ADDENDUM

**TABLE OF CONTENTS**

<u>**Page**</u>

49 C.F.R. Part § 1201 ............................................................................... Add. 1

Surface Transportation Board Decision in
STB Finance Docket No. 35155
     dated August 8, 2008 ........................................................... Add. 2

Surface Transportation Board Decision in
STB Finance Docket No. 35120
     dated March 13, 2008 .......................................................... Add. 5

Surface Transportation Board Decision in
Docket No. FD 35438
     dated April 5, 2012 ............................................................. Add. 8

Surface Transportation Board Decision in
Docket No. FD 35559
     dated November 23, 2011 .................................................. Add. 28

Surface Transportation Board Decision in
Docket No. FD 35559
     dated May 14, 2012 ........................................................... Add. 31

property is retained for reuse, the salvage value shall be recorded in account 712, Materials and Supplies, or other appropriate account at an amount not to exceed its recorded cost (actual or average), or current market value, whichever is lower.

32. *Segment of a business* refers to a component of an entity whose activities represent a separate major line of business or class of customer. A segment may be in the form of a subsidiary, a division, or a department, and in some cases a joint venture or other non-subsidiary investee, provided that its assets, results of operations, and activities can be clearly distinguished, physically and operationally and for financial reporting purposes, from the other assets, results of operations, and activities of the entity. The fact that the results of operations of the segment being sold or abandoned cannot be separately identified strongly suggests that the transaction should not be classified as a disposal of a segment of business.

(a) *Measurement date* means the date on which the management having authority to approve the action commits itself to a formal plan to dispose of a segment of the business, whether by abandonment or sale. The measurement date for disposals requiring Commission approval shall be the service date of the Order authorizing the disposal.

(b) *Disposal date* refers to the date of closing the sale, if the disposal is by sale or the date that operations cease if the disposal is by abandonment.

33. *Service life* means the period between the date when operating property is placed in service and the date of its retirement.

34. *Service value* means the ledger value of operating property less its salvage value (see definition 17).

35. *Track maintenance* is material and labor costs of routine track repairs such as sporadic tie replacement, repair of broken rails, tightening track bolts and track spikes. A more complete list of maintenance items are included in notes to the text of Accounts 8, 9 and 11.

36. *Work equipment* means equipment which can be coupled in a train for movement over the carrier's tracks,

and which is used in the carrier's work service. See equipment listing for account 57, *Work equipment*.

[42 FR 35017, July 7, 1977, as amended at 44 FR 3493, Jan. 19, 1979; 45 FR 31110, May 12, 1980; 48 FR 7183, Feb. 18, 1983; 48 FR 33718, July 25, 1983; 49 FR 2254, Jan. 19, 1984; 52 FR 4321, Feb. 11, 1987]

## GENERAL INSTRUCTIONS

1–1 *Classification of carriers.* (a) For purposes of accounting and reporting, carriers are grouped into the following three classes:

Class I: Carriers having annual carrier operating revenues of $250 million or more after applying the railroad revenue deflator formula shown in Note A.

Class II: Carriers having annual carrier operating revenues of less than $250 million but in excess of $20 million after applying the railroad revenue deflator formula shown in Note A.

Class III: Carriers having annual carrier operating revenues of $20 million or less after applying the railroad revenue deflator formula shown in Note A.

(b)(1) The class to which any carrier belongs shall be determined by annual carrier operating revenues after the railroad revenue deflator adjustment. Families of railroads operating within the United States as a single, integrated rail system will be treated as a single carrier for classification purposes. Upward and downward reclassification will be effected as of January 1 in the year immediately following the third consecutive year of revenue qualification.

(2) If a Class II or Class III carrier's classification is changed based on three years' adjusted revenues the carrier shall complete and file the Classification Index Survey Form with the Board by March 31 of the year following the end of the period to which it relates.

(3) Newly organized carriers shall be classified on the basis of their annual carrier operating revenues after railroad revenue deflator adjustment for the latest period of operation. If actual data are not available, new carriers shall be classified on the basis of their carrier operating revenues known and estimated for a year (after railroad revenue deflator adjustment).

Add. 1

39256                 SERVICE DATE – LATE RELEASE AUGUST 8, 2008
DO

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 35155

FPN-USA, INC.—OPERATION EXEMPTION—TIJUANA-TECATE SHORTLINE

Decided:  August 8, 2008

On July 11, 2008, FPN-USA, Inc. (FPN), a noncarrier, filed a verified notice of exemption under 49 CFR 1150.31 to operate an approximately 44.6-mile line of railroad known as the Tijuana-Tecate Shortline (TTS).  The Mexican State of Baja California owns that portion of the line that is within Mexico.  The San Diego & Arizona Eastern Railway Company (SD&AE), a non-profit public benefit corporation controlled by the San Diego Metropolitan Transit System (SDMT), is the owner of those portions of the rail line in the United States that connect to each end of the TTS.  According to FPN, "almost all" of the line is in Mexico, with the line extending between approximately milepost 15.0 at San Ysidro, CA, and milepost 59.6 at Division, CA, and running through Baja California, Mexico.[1]  In addition to the operating exception it seeks, FPN proposes to acquire what it calls incidental trackage rights over track assertedly being operated by Carrizo Gorge Railway, Inc. (CZRY) between milepost 59.6 at Division and milepost 65.8 at Campo, CA.[2]

On July 24, 2008, SD&AE requested that the Board reject the notice on the grounds that: (1) the transaction is not within the Board's jurisdiction because the TTS is entirely located in Mexico; (2) the "incidental trackage rights" that FPN seeks, which are located within the United States and thus would fall under Board jurisdiction, are actually interchange rights, which do not require advance Board authority; and (3) the notice contains materially false or misleading information in two respects — first, its statement that the proposed transaction entails acquisition of rights to operate in the United States; and second, its erroneous statement that FPN had

_____

[1] According to FPN, it will shortly submit a proposal to the Mexican State of Baja California to operate the line and would commence operations if this proposal is accepted and an operating agreement is executed.

[2] See Carrizo Gorge Railway, Inc.—Operation Exemption—Line of San Diego and Arizona Eastern Railway Company and San Diego & Imperial Valley Railroad Company, Inc., STB Finance Docket No. 34078 (STB served Aug. 16, 2001) (authorizing CZRY to operate approximately 6.2 miles of rail line between milepost 59.60 at Division, CA and milepost 65.80 at Campo, CA, for the purpose of interchanging traffic originating or terminating in Mexico on the TTS).  On July 18, 2008, FPN stated that it intends to enter into a trackage rights agreement with CZRY.

Add. 2

STB Finance Docket No. 35155

notified the San Diego & Imperial Valley Railroad Company (SDIV), the San Diego Metropolitan Transit Development Board (MTDB), and the Union Pacific Railroad Company (UP) of its intent to commence operations over the TTS.[3]

On August 1, 2008, CZRY also sought rejection of FPN's notice of exemption, or alternatively, a stay of the effectiveness of the exemption. While supporting the arguments submitted by SD&AE, CZRY also asserts that, because there is no transportation over the TTS line occurring within the United States, there can be no "incidental" trackage rights subject to Board jurisdiction. Moreover, because the notice of exemption does not contain an agreement for the proposed transaction with the owner of the rail line,[4] or proffer details about when such agreement will be reached, CZRY submits that the Board must reject the notice under 49 CFR 1150.33(c) as prematurely filed. Lastly, CZRY describes as false and misleading FPN's claim that the Mexican government is seeking bids for a new operator due to problems with CZRY's service over the TTS. CZRY states that it resolved past service problems in March 2008, it is under new management, and it has a 20-year agreement to operate the TTS line.

The notice of exemption will be rejected. FPN has not demonstrated that the line over which it seeks authority is even within the United States and thus that this transaction is subject to the Board's jurisdiction under 49 U.S.C. 10501(a)(2)(E). And, without any transportation over a rail line within the United States, there could be no authorization of incidental trackage rights associated with any Board-approved transaction. Incidental trackage rights are embraced within the class exemption established at 49 CFR 1150.31 et. seq. because they are related to the acquisition. Thus an entity seeking to acquire such rights may obtain the Board's authorization to do so by invoking the class exemption. But if the line sought to be acquired by invoking the class exemption lies outside the Board's jurisdiction, the class exemption may not be invoked for that acquisition and is therefore unavailable for any acquisition of trackage rights that may be related to the acquisition, even if the trackage rights would be subject to the Board's jurisdiction if separately sought pursuant to the class exemption for trackage rights, 49 CFR 1180.2(d)(7). Further, on the basis of the filings by SD&AE and CZRY, it appears that the notice contains false and misleading information regarding, at a minimum, the statement that FPN provided notice to officials of MTDB, SD&IV, and UP of the filing for exemption.

---

[3]  In a letter filed on July 21, 2008, SDIV, which provided freight service over a line of railroad that includes the TTS until it subleased its operations over the TTS to CZRY, stated that, in fact, FPN had not notified SDIV that it intended to operate over the TTS. On August 1, 2008, SDIV also filed a letter in support of the request for rejection filed by SD&AE.

[4]  CZRY also contends that it does not own the track within the United States between Division and Campo, CA, for which FPN seeks trackage rights (and if it did, would not grant trackage rights to FPN).

2

STB Finance Docket No. 35155

Notices of exemption are intended to be used for routine and non-controversial cases.[5] But, as filed, and in light of the issues raised by SD&AE, SDIV and CZRY, FPN's notice does not seem routine or non-controversial, and indeed raises more questions than it answers. Where, as here, there are too many unanswered questions, the Board will reject a notice.[6]

The decision does not preclude FPN from filing a new notice of exemption that provides clear and adequate information and meets the relevant criteria, or from filing a petition for exemption if the authority it seeks will raise controversial or complex issues.

FPN filed a request for a protective order concurrently with its notice. Because the notice will be rejected, the request for a protective order will be dismissed as moot.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1.   The notice of exemption is rejected.

2.   The request for a protective order is dismissed.

3.   This decision is effective on its service date.

By the Board, Joseph H. Dettmar, Acting Director, Office of Proceedings.

Anne K. Quinlan
Acting Secretary

---

[5]   See Northeast Interchange Railway, LLC—Lease and Operation Exemption—Line in Croton-On-Hudson, NY, STB Finance Docket No. 34734 (STB served Nov. 17, 2005); James Riffin d/b/a the Northern Central Railroad–Acquisition and Operation Exemption–In York County, PA, STB Finance Docket No. 34501 (STB served Feb. 23, 2005).

[6]   See Pro-Go Corp.—Operation Exemption—in Suffolk County, NY, STB Finance Docket No. 35120 (STB served Mar. 13, 2008).

3

38851                SERVICE DATE – LATE RELEASE MARCH 13, 2008
DO

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 35120

PRO-GO CORP.—OPERATION EXEMPTION—IN SUFFOLK COUNTY, NY

Decided:  March 13, 2008

On February 28, 2008, Pro-Go Corp. (Pro-Go) filed a verified notice of exemption (the Notice) under 49 CFR 1150.31 to operate a rail line—a set of three tracks totaling about 1 mile in length—extending between approximately mileposts 50 and 52 on the Long Island Railroad (LIRR) in Holtsville, Suffolk County, NY.  In the notice, Pro-Go states that shipper Prima Asphalt Concrete, Inc. (Prima), allowed it to use the line beginning in 1988 to receive shipments of stone for Prima and other shippers.  Pro-Go adds that, "until recently," it also received shipments of propane gas, bentonite clay, and other industrial products over the rail line.  Pro-Go states that it plans to "restart" movements on the rail line as soon as its requested exemption is granted.

The notice of exemption will be rejected.  Pro-Go fails to submit sufficient information for the Board to determine whether the proposed transaction qualifies for the class exemption at 49 CFR 1150.31, et seq.

First, subsection 1150.33(c) requires that the notice contain "[a] statement that an agreement describing the creation of a class III railroad has been reached or details about when an agreement will be reached."  The notice states that Pro-Go was established in 1988.  That year, the notice says, Pro-Go acquired from Max Fehr, father of the president of Prima Asphalt Concrete, Inc. (Prima), a one-acre parcel upon which some railroad track existed and upon which, subsequently, an additional piece of railroad track was constructed.  Also, apparently later in 1988, Pro-Go obtained a "license" from Prima, "which allowed Pro-Go to use the entire set of railroad tracks over which Pro-Go receives stone shipments for Prima, Tilcon Stone and others."  Prima, the notice indicates, acquired five acres of real estate from Max Fehr in approximately 1963 bordering the LIRR and built a railroad track between milepost 50 and milepost 52 of the LIRR.  Additional trackage was constructed in 1963 and 1964, and a second track was constructed in 1972.

The facts recited in the notice raise questions which the notice does not answer.  Is the agreement that is required to be identified under section 1150.33(c) the 1988 conveyance from Max Fehr, the 1988 "license" from Prima, both, or something else?  Does Pro-Go have a corporate relationship with Prima, Tilcon Stone, or any of the other shippers located on the trackage?  Has Pro-Go been conducting for-hire service without authority since 1988?  Why is Pro-Go seeking Board authority for its operations now?  The Board needs this information to be

STB Finance Docket No. 35120

able to determine what the proposed transaction is and whether this transaction properly qualifies for the class exemption, or whether an individual petition for exemption or a formal application will be needed in order to properly address the issues raised by this transaction.

Second, subsection 1150.33(e)(1) requires that the notice contain a brief summary of the transaction, including ". . . the name and address of the railroad transferring the subject property." Pursuant to the notice, Pro-Go would be acquiring authority to operate over the track in question. Because for-hire operations are to be conducted over the track, and perhaps are already being conducted, the owner of the rail line generally requires authority from the Board pursuant to 49 U.S.C. 10901. The notice does not indicate whether Prima, the owner of a portion of the line over which Pro-Go would conduct its operations, has common carrier authority from this agency. Moreover, although Pro-Go seeks authority only to operate the line, in some places the notice refers to the transaction as an acquisition of assets or an acquisition of the line. Pro-Go must clarify Prima's status and spell out exactly what is transpiring in the transaction for which it has invoked the class exemption.

Finally, subsections 1150.33(e)(3) and (4) require the notice to include the mileposts of the subject property (including any branch lines) and the total route miles, respectively; and subsection 1150.33(f) requires a map clearly indicating the area to be served. Taken together, the line description and map provided in the notice do not provide sufficiently clear information regarding the location and extent of the line. In any new filing, Pro-Go must provide a better description of the location and extent of the line at issue. Is the only trackage involved (which Pro-Go describes as approximately 1 mile in length) the two parallel tracks totaling approximately 4000 feet and the third track totaling approximately 650 feet that Pro-Go has mentioned in its notice? The trackage is said to be between LIRR mileposts 50 and 52 but it is unclear whether those are the actual beginning and ending mileposts of the line in question, and the map appended to the notice does not clearly show any parallel tracks, the location of a distinct third track, or any milepost locations.

For all of these reasons, Pro-Go's notice will be rejected. The rejection is without prejudice to Pro-Go refiling a new notice of exemption or some other request for authority which provides clear and adequate information as described herein.

It is ordered:

1. The notice of exemption is rejected without prejudice to refiling consistent with this decision.

2

Add. 6

STB Finance Docket No. 35120

2. This decision will be effective on its service date.

By the Board, David M. Konschnik, Director, Office of Proceedings.


Anne K. Quinlan
Acting Secretary

3

41624
EB

SERVICE DATE – APRIL 5, 2012

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 35438

EIGHTEEN THIRTY GROUP, LLC—ACQUISITION EXEMPTION—IN ALLEGANY
COUNTY, MD

Docket No. FD 35437

GEORGES CREEK RAILWAY, LLC—OPERATION EXEMPTION—IN ALLEGANY
COUNTY, MD

Docket No. FD 35436

DUNCAN SMITH AND GERALD ALTIZER—CONTINUANCE IN CONTROL
EXEMPTION—EIGHTEEN THIRTY GROUP, LLC AND GEORGES
CREEK RAILWAY, LLC

Digest:[1]  The Board denies James Riffin's motion to dismiss these proceedings for
lack of jurisdiction and Riffin's and Lois Lowe's motions to reject as void three
prior authorizations permitting:  (1) Eighteen Thirty Group, LLC, to acquire a line
of railroad in Allegany County, Md.; (2) Georges Creek Railway, LLC, to operate
the line; and (3) Duncan Smith and Gerald Altizer to continue in control of
Eighteen Thirty Group and Georges Creek Railway upon those firms becoming
rail carriers (collectively Respondents).  The Board also denies Respondents'
request that Riffin be ordered to cease representing Lowe and grants Riffin's and
Lowe's request that Respondents' attorney be ordered to cease representing them
before the Board in any matter relating to the line.

Decided:  April 4, 2012

INTRODUCTION

In August 2005, CSX Transportation, Inc. (CSXT), filed for permission to abandon the
Georges Creek Branch a dormant rail line in western Maryland, extending between milepost BAI
27.0 near Morrison and milepost BAI 18.46 at the end of the track near Carlos, a distance of 8.54

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader. It may not be cited to or relied upon as precedent.  Policy Statement
on Plain Language Digests in Decisions, EP 696 (STB served Sept. 2, 2010).

Docket No. FD 35438, et al.

miles in Allegany County, Md. (the Line).[2]  Before the Line was abandoned, however, CSXT agreed to sell the Line to "WMS" or "WMS, LLC," which later referred to itself as Western Maryland Services, LLC.  The Board approved the sale and dismissed CSXT's abandonment filing.  Before the sale could take place, WMS's financing fell through.  James Riffin agreed to provide the required financing in exchange for a nearly complete ownership interest in WMS. Riffin paid CSXT the purchase price, and WMS asked for Board permission to substitute Riffin for WMS as the purchaser.  While the substitution request was pending, CSXT issued the deed to the Line to "WMS, LLC, a Maryland Limited Liability Company."  Riffin claimed that CSXT had deeded the Line to the wrong entity, but he was unsuccessful in forcing CSXT to redeed the Line to him.  When Riffin subsequently filed for personal bankruptcy, the trustee of his bankruptcy estate claimed equitable title to the Line, and, subject to approval of the bankruptcy court, reached an agreement to sell the Line to Eighteen Thirty Group, LLC (Eighteen Thirty).

The trustee's agreement to convey the Line to Eighteen Thirty prompted a number of filings before the Board to satisfy the requirements of the Interstate Commerce Act:  (1) Eighteen Thirty sought permission to acquire the line; (2) Georges Creek Railway, LLC (Georges Creek), a corporate affiliate of Eighteen Thirty, sought permission to operate the line; and (3) Duncan Smith and Gerald Altizer, the owners of Eighteen Thirty and Georges Creek, sought permission to continue in control of those entities upon their becoming rail carriers.  Over the objections of Riffin and one of his business associates, Lois Lowe, the Board approved the three requests.

Riffin and Lowe now seek to undo the Board's approval of these requests.  Riffin has moved to dismiss the filings by Eighteen Thirty and Georges Creek on jurisdictional grounds. Riffin and Lowe have also asked the Board to reject the filings of Eighteen Thirty, Georges Creek, and Smith and Altizer, using a series of arguments that the filings contained false and misleading information.

Eighteen Thirty, Georges Creek, and Smith and Altizer (collectively, Respondents) responded to these arguments on the merits and raised an ancillary issue, that Riffin has engaged in the unauthorized practice of law before the Board.  Respondents ask that Riffin be ordered to stop representing Lowe.

As explained later in this decision, we are denying Riffin's motion to dismiss these proceedings and Riffin's and Lowe's motions to reject Respondents' three filings, as noted above.  We also are denying Respondents' request that Riffin be ordered to cease representing Lowe.  Finally, we are granting in part and denying in part a number of other procedural requests, including Riffin's and Lowe's request that the Board order Respondents' attorney to cease representing them before this agency in any matter relating to the Line.

---

[2] See CSX Transp., Inc.—Aban. Exemption—in Allegany Cnty., Md., AB 55 (Sub-No. 659X) (STB served Oct. 26, 2005).  Hereinafter, CSX Transp., Inc.—Aban. Exemption—in Allegany Cnty., Md., Docket No. AB 55 (Sub-No. 659X), will be referred to as "CSXT— Allegany County" or "AB 55 (Sub-No. 659X)."

2

Docket No. FD 35438, et al.

## BACKGROUND

*CSXT's Sale of the Line.*  As explained above, six years ago, CSXT sought Board approval to abandon the Line by filing a notice of exemption.  On September 8, 2005, an entity represented by attorney John Heffner and identifying itself as "WMS, LLC" late-filed a formal expression of intent to file an offer of financial assistance (OFA) under 49 U.S.C. § 10904 and 49 C.F.R. § 1152.27.[3]  The parties now before us agree that "WMS, LLC" was an acronym for a company chartered in West Virginia called "Western Maryland Services, LLC," although no one informed the Board of this at the time.  (For purposes of clarity, we will refer to this entity as "WMS" for the remainder of this decision.)  CSXT filed a reply stating that it did not oppose the request filed by WMS.

The Board accepted WMS's September 8, 2005 notice of intent and tolled the time for it to file an OFA, to allow WMS to seek further information for preparing an OFA.[4]  On October 21, 2005, WMS, again referring to itself as "WMS, LLC," filed an OFA to purchase the Line for $360,610.  Instead of clarifying that WMS, LLC, was an acronym for the company that carried the longer name "Western Maryland Services," the OFA stated that "WMS is a Maryland limited liability company established by Gerald Altizer and chartered in West Virginia for the purpose of acquiring, preserving, and operating light density rail lines in Maryland and contiguous areas in Pennsylvania and West Virginia," and specifically referred to Altizer as "WMS' owner."[5]

The OFA also identified the sources of WMS's financing for the proposed acquisition of the Line.  Based on this information, on October 26, 2005, the Board found WMS financially responsible and postponed the effective date of the abandonment to give the parties an opportunity to negotiate a voluntary sale.  On November 21, 2005, Heffner filed a letter with the Board stating that WMS had agreed to CSXT's purchase price for the Line.  The Board authorized WMS to acquire and operate the Line and dismissed CSXT's notice of exemption to abandon the Line, effective upon consummation of the sale.[6]

Subsequently, part of WMS's financing for the acquisition failed to materialize, and Altizer negotiated with Riffin, who agreed to provide the necessary financing in exchange for a 98% interest in WMS and the company's right to acquire the Line.[7]  Meanwhile, CSXT and

---

[3]  Petition to Toll Time for Filing OFA filed in AB 55 (Sub-No. 659X), Sept. 8, 2005.

[4]  See CSXT—Allegany County, (STB served Sept. 23, 2005).

[5]  OFA filed in AB 55 (Sub-No. 659X), Oct. 21, 2005, at 2, 7.

[6]  See CSXT—Allegany County, (STB served Dec. 14, 2005).

[7]  See Motion to Compel filed in AB 55 (Sub-No. 659X), Jan. 14, 2008, at 2.

3

Docket No. FD 35438, et al.

Riffin's Post-Sale Actions. On January 14, 2008, Riffin filed a motion asking this Board to compel CSXT to reissue the deed to the Line to him in his own name as an individual. In the motion, Riffin attempted to justify the forced reissuance on the grounds that there had been a mistake concerning "WMS" throughout most of the OFA process. Specifically, Riffin argued to the Board that: (1) although the initial pleadings did not identify it as such, "'WMS LLC' was an acronym for 'Western Maryland Services, L.L.C., a **West Virginia** Limited Liability Company;" (2) "'*WMS, L.L.C., a Maryland limited liability company,' did not exist on December 14, 2005*, the date the Board granted 'WMS LLC' authority to acquire and operate the Line"; (3) Riffin acquired the 98% ownership interest in "Western Maryland Services, LLC, a **West Virginia** Limited Liability Company" in or around February 2006; and (4) "[o]n **May 26, 2006**, Riffin had the legal entity 'WMS, L.L.C.' chartered in Maryland [and that] Riffin is the sole owner of 'WMS, L.L.C., a **Maryland** limited liability company.'"[16] CSXT opposed the motion.[17] The Board denied Riffin's motion to compel, stating that "[a]ny disputes relating to the validity of the purchase agreement or the transfer of the deed involve questions of state contract and property law. The Board is not the proper forum to resolve such disputes."[18] Riffin challenged unsuccessfully that decision in court.[19]

Riffin now asserts that, between October 14, 2008, and May 5, 2009, while his court challenge was pending, he transferred various amounts, totaling 96%, of the "track and right-of-way of the Line, whether held by WMS LLC, Western Maryland Services LLC or James Riffin," to Lowe and three other individuals, and that on January 5, 2010, Lowe acquired a "controlling interest (51%) in WMS LLC, in Western Maryland Services LLC, and now has an undivided 51% in the track material and right-of-way associated with the Line."[20] Riffin neither sought nor obtained Board approval for these transfers.

On May 6, 2009, after Riffin completed the purported transfer of assets to Lowe and the others, he asked the Board to declare that he had previously become a rail carrier in August 2006, when the Board authorized him to be substituted for WMS as the purchaser of the Line. The Board declined, stating that, "although Riffin obtained authority to acquire and operate the Allegany line, he is not a rail carrier because he lacks the ability to provide rail service on that line."[21] The Board also noted that Riffin had rendered a different version of the events relating to the acquisition of the Line in another case. In that case, Riffin had stated that he had deliberately filed the original OFA for the Line in October of 2005 under the pseudonym "WMS" in order to conceal his involvement from Maryland state regulators, whom he suspected

---

[16] Motion to Compel filed in AB 55 (Sub-No. 659X), Jan. 14, 2008, at 1-3.

[17] See Reply to Motion to Compel, filed in FD 35438, Feb. 4, 2008.

[18] CSXT—Allegany County (STB served Apr. 24, 2008) slip op. at 3.

[19] See Riffin v. STB, No. 08-1208, 2010 WL 606188 (D.C. Cir. Jan. 22, 2010).

[20] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 9-10; see also Lowe Comments filed in FD 35438, Nov. 3, 2010, at 10.

[21] Riffin—Petition, slip op. at 1.

5

Docket No. FD 35438, et al.

would object to any attempt by him to acquire the Line in any manner.[22]  The Board declined to rule on the accuracy of either of these versions, but noted "that this inconsistency undermines Riffin's credibility with the Board."[23]

On January 20, 2010, Riffin filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code.[24]  In schedules accompanying his bankruptcy petition, Riffin stated that he retained a 4% interest in "WMS, LLC" after transferring a total of 96% of that company to Lowe and three others.  The trustee appointed to oversee Riffin's bankruptcy estate determined that Riffin possessed an equitable interest in the Line and arranged for its sale to Eighteen Thirty, subject to approval of the bankruptcy court.[25]

Eighteen Thirty's Acquisition of the Line.  According to Respondents, Altizer severed his relationship with Riffin after the Board's August 16, 2006 decision substituting Riffin in the OFA , and Altizer obtained new financing from Smith for the purpose of acquiring the Line.  Together they established Eighteen Thirty to pursue the acquisition of the Line after Riffin filed for bankruptcy, and they subsequently reached agreement with the trustee for the sale of the Line.  To permit the sale to go forward, Eighteen Thirty, Georges Creek, and Smith and Altizer sought the necessary regulatory approvals from the Board in four filings made on October 19, 2010.  Three of the filings were notices of exemption which were to become effective on November 18, 2010:  (1) Eighteen Thirty filed a verified notice of exemption under 49 C.F.R. § 1150.31 to acquire the Line;[26] (2) Georges Creek filed a verified notice of exemption under § 1150.31 to operate the Line;[27] and (3) Altizer and Smith filed a verified notice of exemption under 49 C.F.R. § 1180.2(d)(2) to continue in control of Eighteen Thirty and Georges Creek upon their becoming Class III rail carriers[28] (collectively, the Notices).  The Board served the Notices on November 4, 2010, and published them in the Federal Register on November 5, 2010.[29]  In the fourth filing, Eighteen Thirty sought relief from the statutory 5-year bar in 49 U.S.C. § 10904(f)(4)(A), that prevents the transfer of a rail line sold under the OFA process to anyone other than the carrier from whom it was purchased.  See 49 U.S.C. § 10904(f)(4)(A).

---

[22]  See James Riffin—Petition for Declaratory Order, FD 34997, Motion for Administrative Stay (filed Dec. 17, 2007) at 4 ("On October 21, 2005, Petitioner, knowing full well that if the true identity of the Offerer were to be known, an objection would be filed, filed an Offer of Financial Assistance under the pseudonym WMS (in which Petitioner had a 98% ownership interest), to purchase from CSX[T] the Georges Creek line of railroad CSX[T] had filed to abandon.").

[23]  Riffin—Petition, slip op. at 2, n.4.

[24]  In re Riffin, No. 10-11248 (Bankr. D. Md. Jan. 20, 2010).

[25]  See Notice of Exemption in FD 35438 at 4-5.

[26]  See Id.

[27]  See Notice of Exemption filed in FD 35437.

[28]  See Notice of Exemption filed in FD 35436.

[29]  75 Fed. Reg. 68,397-68,402.

6

Add. 12

Docket No. FD 35438, et al.

Because CSXT had sold (or attempted to sell) the Line under the OFA process in CSXT—Allegany County, Eighteen Thirty filed a petition in that docket for an exemption from § 10904(f)(4)(A) to permit it to purchase the Line from the trustee of Riffin's bankruptcy estate.[30]

In the ensuing weeks, Riffin and Lowe (Petitioners) sought to block the exemptions from becoming effective. On November 3, 2010, Riffin and Lowe individually filed comments objecting to each of the Notices and to Eighteen Thirty's petition for exemption from § 10904(f)(4)(A). Riffin also filed a motion to consolidate all four proceedings.

On November 8, 2010, Petitioners individually filed motions to stay and to revoke each of the Notices[31] and on November 17, 2010, Respondents filed a joint reply. On November 17, 2010, the Board denied Petitioners' motions to stay the Notices and indicated that it would address their "motions to revoke or reject" in a separate decision. Although the Board had already ruled on their stay motions, Petitioners individually filed replies on December 1, 2010, to Respondents' joint reply.

On December 8, 2010, Riffin filed a motion to dismiss the Notices for lack of jurisdiction. Respondents filed a joint reply on December 21, 2010, and Allegany County, Md. (Allegany), filed a motion for leave to intervene and a reply on December 28, 2010. Riffin filed a reply on January 11, 2011, to Allegany's reply.[32]

---

[30] See Petition for Exemption from 49 U.S.C. § 10904(f)(4) filed in AB 55 (Sub-No. 659X), Oct. 19, 2010.

[31] Petitioners incorporated by reference their previously filed comments into their motions to stay and revoke. Although their pleadings are styled as "motions to revoke," Petitioners rely exclusively on rejection criteria and specifically request rejection, asserting that the Notices are void ab initio because they contain material misrepresentations. We will therefore treat them as motions to reject and will not further discuss revocation.

[32] Respondents contend that Petitioners' replies of December 1, 2010, constitute replies to replies and, as such, should be rejected under 49 C.F.R. § 1104.13(c). Both Respondents and Allegany contend that Riffin's motion to dismiss was filed untimely, and they request that it be rejected under § 1104.13(c). Allegany also requests that Riffin's motion to dismiss be rejected as a reply to a reply. Riffin and Lowe request that their replies be accepted, even if they were filed in violation of § 1104.13(c), to provide the Board with a more complete record. In his reply of January 11, 2011, Riffin asserts that his motion to dismiss may not be rejected because the jurisdictional issues contained in it may be raised at any time. In the interest of a more complete record, we are granting Petitioners' requests and accepting their replies into the record. We are also denying Respondents' and Allegany's requests to reject Riffin's motion to dismiss. Finally, we are granting Allegany's motion for leave to intervene. The motion is unopposed, and Allegany is both a party to CSXT—Allegany County and the local government unit within which the Line is located.

7

Add. 13

Docket No. FD 35438, et al.

In a December 30, 2010 decision,[33] the Board granted Eighteen Thirty's request for an exemption from § 10904(f)(4)(A) to permit it to acquire the Line and denied Riffin's motion to consolidate the four proceedings as it pertained to CSXT—Allegany County.

On February 16, 2011, the U.S. Bankruptcy Court for the District of Maryland approved the sale of the Line to Eighteen Thirty.[34] Eighteen Thirty subsequently notified the Board in a letter filed on March 4, 2011, that it had consummated the sale on March 3, 2011.

DISCUSSION AND CONCLUSIONS

In the motions to dismiss and to reject, Petitioners seek to block Respondents from acquiring and operating the Line. Although the sale has been consummated, these motions are not moot. If, as Petitioners claim, either the Board lacked authority to permit the transactions or the Notices are void ab initio, then Respondents' purchase and operation of the Line would be unauthorized. For this reason, we have reviewed the above motions, and, as discussed below, we are denying them on the merits. In addition, as discussed in the introduction, we are denying Respondents' request that Riffin be ordered to cease representing Lowe, because we conclude that Lowe was representing herself. Finally, we will order Heffner to cease representing Respondents before this agency in any matter relating to the Line, as their interests are adverse to the interests of the attorney's former client, WMS.

1. RIFFIN'S MOTION TO DISMISS

Riffin contends that the Board must dismiss the Notices because it lacks jurisdiction over the transactions. Riffin suggests that, in allegedly deeding the Line to WMS-Maryland, rather than to WMS, CSXT transferred the Line to the wrong entity. Riffin also notes that WMS-Maryland failed to record the deed or to assign it to Riffin.[35] Riffin thus asserts that the Board's jurisdiction only extends to common carrier railroads, and that no common carriers are associated with the Line, because: (1) according to the Board's finding in Riffin—Petition, Riffin is not a rail common carrier; (2) "Western Maryland Services LLC has never acquired legal title to the Allegany Rail Line"; and (3) "WMS LLC, has never sought, nor received, [Board] authority to acquire and operate the Allegany Rail Line [and s]ince the deed from CSX to WMS LLC has never been recorded, WMS LLC does not have legal title to the Allegany Rail Line . . . ."[36]

---

[33] See CSXT—Allegany County (STB served Dec. 30, 2010).

[34] See Transcript of Ruling, In re Riffin, No. 10-11248 (Bankr. D. Md. Feb. 16, 2011) (Transcript of Ruling).

[35] In his December 1, 2010 reply at 4, Riffin explains that "WMS LLC did not record the deed because WMS LLC never received authority to acquire or to operate the Allegany Rail Line."

[36] Motion to Dismiss filed in FD 35438 et al. at 5, 12.

8

Docket No. FD 35438, et al.

Riffin next asserts that "there has been no rail carrier on the Allegany Rail Line since July 10, 2006, the date CSX[T] consummated its abandonment of the Allegany Rail Line."[37] He concludes that "since July 10, 2006, no common carrier railroad has been associated with the Allegany Rail Line, and since . . . 'Jurisdiction extends to common carrier railroads only'. . . . no one has a common carrier obligation with respect to the Allegany Rail Line, then the Line is a 'private line,' and as such **is not subject to the Board's jurisdiction**."[38]

Finally, Riffin argues that the Board must dismiss the Notices for lack of jurisdiction to be consistent with its prior finding, cited in note 22, supra, that Riffin is not a common carrier. In this regard, Riffin asserts that unless the Board reverses itself and finds that he is a rail carrier, then,

> [T]he STB does not have jurisdiction over Riffin, nor does it have jurisdiction over the Allegany Rail Line [and w]ithout jurisdiction, the STB does not have the authority to order Riffin or his transferees to reconvey the property interests that Riffin conveyed [and cannot] enjoin Riffin or his transferees from removing the rails and track infrastructure, then selling those assets so that Riffin can obtain his 4% interest in those assets, and so that the transferees can obtain their 96% interest in those assets, in the form of cash.[39]

Riffin's circular analysis is in error. Once a rail line is part of the national rail system, it falls within the Board's jurisdiction, and it remains so until the Board authorizes the line's abandonment <u>and</u> the abandonment is consummated.[40] Here, CSXT initially sought Board authority to abandon the Line in the original notice of exemption. However, contrary to Riffin's assertion, CSXT never consummated the abandonment. Instead, CSXT negotiated a voluntary sale of the Line under the OFA process. In its letter of July 10, 2006, CSXT reported that it had consummated the Line's sale, and not its abandonment. Indeed, the OFA process itself contemplates a continuation of rail common carrier service in the hands of the entity pursuing an OFA, <u>not</u> an abandonment. Because CSXT never abandoned the Line, it has remained an active line of railroad subject to the Board's jurisdiction.

This conclusion is not altered by any alleged errors in consummating the sale. None of these errors (e.g. the alleged transfer of the Line to the wrong entity or WMS-Maryland's failure to record the deed), whether correctly characterized or not, affected the Board's jurisdiction over the Line. The Board previously granted authority for Riffin to substitute for WMS as the

---

[37] <u>Id.</u> at 5.

[38] Id. (citations omitted).

[39] <u>Id.</u> at 6 (footnote omitted).

[40] <u>See, e.g.</u>, <u>Hayfield N. R.R. v. Chicago & N. W. Transp. Co.</u>, 467 U.S. 622, 633 (1984); <u>Honey Creek R.R.—Petition for Declaratory Order</u>, FD 34869 (STB served June 4, 2008). The Board's jurisdiction extends to rail lines that parties seek to take out of the interstate rail network. A party's actions in ceasing to provide rail operations, or its desire or intent to do so, do not deprive the Board of its jurisdiction to approve the removal of the line from the national rail network.

9

Add. 15

Docket No. FD 35438, et al.

purchaser under the OFA process. That authorization allowed Riffin to acquire the Line through an OFA, but it did not, and could not, without more, convert Riffin into a rail common carrier. Other steps were necessary for Riffin to complete that process, including perfecting his ownership under applicable state law. Riffin failed to complete those other steps.[41] His failure to become a common carrier, however, did not in any respect remove the Line from the Board's jurisdiction. Parties may not de facto effectuate the abandonment of a rail line by failing to consummate a sale. At all times, the Line has remained subject to the Board's jurisdiction, and Board authorization continues to be required for subsequent transfers or the abandonment of the Line .

## 2. PETITIONERS' MOTIONS TO REJECT

Under 49 C.F.R. § 1150.32(c), a notice of exemption is void ab initio and will be rejected if it contains false or misleading information. Petitioners claim that the Notices contain material misrepresentations in numerous respects. According to Petitioners, the Notices allegedly misrepresent that: (1) the proposed transactions are not subject to certain environmental review; (2) Riffin was the railroad transferring the Line to Eighteen Thirty; (3) there were no infirmities associated with title to the Line; (4) the trustee could transfer the common carrier obligation for the Line; (5) Smith and Altizer were the proper parties to seek continuance-in-control authority; and (6) there was no conflict of interest in Heffner representing Respondents. In addition, Petitioners assert that the Notices are "controversial" and, for that reason as well, must be rejected.

A number of the bases for Petitioners' rejection arguments distort the Board's "misrepresentation" grounds for rejecting or voiding ab initio a notice of exemption. Petitioner's multiple allegations of false statements in many instances are not based on alleged misrepresentation of specific "facts," but rather on Petitioner's efforts to recast Respondents' different legal interpretation of certain facts as "misrepresentation." Divergent views as to the proper characterization or status of "title," for example, or a dispute over whether an environmental study might be required, would not mean that one or the other party's legal position is a "misrepresentation of fact." Thus, many of Petitioner's assertions do not constitute "facts" that Respondents have "misrepresented," justifying a rejection, but rather are legal claims to be addressed within the context of the filings. In any event, as discussed below, none of these misrepresentation claims, whether factual or instead legal in nature, has merit. Petitioner's requests for rejection will therefore be denied.

Environmental review. Petitioners contend that the Notices falsely claim that the proposed transactions are exempt from environmental review under 49 C.F.R. § 1105.6(c)(2)(i). They argue that Respondents' proposed operation of the Line requires environmental review because it will result in significant changes in carrier operations. Specifically, Petitioners contend that the proposed operation, as discussed in the petition for exemption from 49 U.S.C. 10904(f)(4)(A) that Respondents filed in CSXT—Allegany County, will exceed both the

---

[41] See supra note 21.

10

Docket No. FD 35438, et al.

energy threshold of 49 C.F.R. § 1105.7(e)(4)(iv) and the air quality threshold of 49 C.F.R. § 1105.7(e)(4)(v). These contentions lack merit.

The energy threshold in § 1105.7(e)(4)(iv) triggers environmental review when the proposed operation will cause a diversion from rail to motor, resulting in a decrease in overall energy efficiency. Here, however, as Riffin himself concedes, the Line has had no traffic for years. Thus, the only diversion likely to occur from the proposed acquisition and operation of the Line would be from motor to rail. Accordingly, the Notices correctly stated that the proposed transaction would not cause any operational change that exceeds the energy threshold in § 1105.7(e)(4)(iv).

Similarly, under Board precedent, the air quality threshold in § 1105.7(e)(4)(v) applies when the proposed operation will result in a 100% increase in rail traffic or an increase of at least eight trains per day.[42] Riffin contends that, because there has been no rail traffic on the Line, the proposed operation far exceeds the 100% threshold. The 100% threshold, however, cannot sensibly apply to an inactive rail line. Because Petitioners effectively concede that the proposed operation would not exceed the 8-trains-per-day threshold,[43] we conclude that the Notices correctly stated that the proposed action would not exceed the air quality threshold of § 1105.7(e)(4)(v).

The transferor. Petitioners assert that it is Board practice under 49 C.F.R. § 1150.31 to reject notices of exemption that fail to identify the railroad that is transferring the line. Thus, they argue that, "[i]n light of the Board's . . . decision in FD 35245 [finding that Riffin is not a rail common carrier], it was a material misrepresentation for [Eighteen Thirty] to represent that Riffin, or Riffin's bankruptcy trustee, would be the railroad transferring the Line."[44]

However, Eighteen Thirty did not identify Riffin or the trustee of his bankruptcy estate as the railroad transferring the Line. Rather, Eighteen Thirty's notice stated that: (1) the Board had granted Riffin authority to acquire the Line; and (2) the trustee claimed to own an equitable interest in the Line and to have the power to direct the disposition of the Line, subject to the

---

[42] See Mo. Cent. R.R.—Acquis. & Operation Exemption—Lines of Union Pac. R.R., FD 33508, slip op. at 7 (STB served Apr. 30, 1998) (finding that where there had been no recent traffic on a rail line that would be reactivated, the relevant threshold for environmental review is eight trains per day), aff'd sub nom. Lee's Summit, Mo. v. STB, 231 F.3d 39, 42 (D.C. Cir. 2000).

[43] Petitioners claim that the proposed action would generate about 450-500 carloads per year, less than two carloads per day. See Petition for Exemption from 49 U.S.C. § 10904(f)(4)(A) filed in AB 55 (Sub-No. 659X), at 8.

[44] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 5.

11

Docket No. FD 35438, et al.

approval of the bankruptcy court. These statements fully and accurately described the Board's action and the trustee's claim.[45]

Nor was it improper for Eighteen Thirty to use the class exemption from 49 U.S.C. § 10901, where a bankruptcy trustee claimed the equitable power to direct the sale of the Line. To qualify for use of that class exemption, an applicant seeking to acquire and/or operate a rail line under 49 C.F.R. § 1150.32 must file a verified notice of exemption providing details about the transaction, see 49 C.F.R. § 1150.33, and a brief caption summary conforming to the format in 49 C.F.R. § 1150.34. While § 1150.33(e)(1) provides that the notice of exemption must contain "[a] brief summary of the proposed transaction including: (1) The name and address of the railroad transferring the subject property," § 1150.34 provides that the caption summary must specify the name of "[t]he transferor," not the "transferring railroad."

Notwithstanding the wording in § 1150.33(e)(1), the transferor of a rail line need not be a rail carrier to qualify for use of the class exemption. Nor is there a presumption that the transferor of a line is necessarily a rail carrier, simply because the parties to the transaction invoked the class exemption. Under 49 C.F.R. § 1150.31, the class exemption extends to "all acquisitions and operations under section 10901," which includes those acquisitions and operations where the transferor is a noncarrier.[46]

Alleged "Title Infirmities." Petitioners assert that "[i]t was a material misrepresentation for [Eighteen Thirty] not to disclose the infirmities associated with title to the Line."[47] Petitioners do not clearly identify the alleged title infirmities, although we presume they are referring to the fact that CSXT deeded title to the Line to "WMS L.L.C., a Maryland limited liability company, [which] never sought, nor acquired authority to acquire or operate the Line . . . ."[48] This claim appears to be set out more fully in Riffin's motion to compel in CSXT—Allegany County. There Riffin argued that there were two legal infirmities in connection with CSXT's transfer of the deed to the Line: (1) that **"[a]t the time the Notice of Intent was filed, there was no legal entity 'WMS LLC,' either in West Virginia or in Maryland;"** and (2) that "'WMS LLC, a

---

[45] See Eighteen Thirty—Acquis., Verified Notice of Exemption at 4-5; Transcript of Ruling at 13-14, 22.

[46] See, e.g., Class Exemption for the Acquis. & Operation of Rail Lines under 49 U.S.C. § 10901, 1 I.C.C.2d 810 (1983) ("The NPR proposed to exempt from regulation all acquisitions and operations under 49 U.S.C. 10901, including . . . operation by a new carrier of rail property acquired by a third party . . . ."); Riverview Trenton R.R.—Acquis. & Operation Exemption—Crown Enters., Inc., FD 33980 (STB served and published at 66 Fed. Reg. 1,371 on Jan. 8, 2001); Ohio Valley R.R.—Acquis. & Operation Exemption—Harwood Props., Inc., FD 34486 (STB served and published at 66 Fed. Reg. 21,899 on Apr. 22, 2004).

[47] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 5.

[48] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 6.

12

Docket No. FD 35438, et al.

**Maryland** limited liability company,' a legal entity [, . . .] **has never received authority to acquire the Line.**"[49]

There was nothing false or misleading in Eighteen Thirty not disclosing that CSXT transferred the deed to the Line to "WMS, LLC, a Maryland limited liability company." Eighteen Thirty's notice specifically stated that:  (1) the proposed acquisition was a result of Riffin's bankruptcy; (2) the trustee of Riffin's bankruptcy estate asserted that the bankruptcy estate owned the equitable interest in the Line and that the trustee had the power to dispose of the Line; and (3) the trustee had entered into an agreement to sell the Line to Eighteen Thirty, subject to the approval of the bankruptcy court.  Petitioners have not shown any of these statements to be false or misleading.  As the bankruptcy court later determined after Riffin filed for bankruptcy in January 2010, the unrecorded deed that CSXT had apparently transferred to "WMS, LLC, a Maryland liability company" became "subordinate to the rights of the estate in bankruptcy."[50]  Accordingly, when Respondents filed the Notices in October 2010, there was no title infirmity to disclose.

Alternatively, Petitioners' title-infirmity claim may rest on their legal position that there was a defect in the OFA process.  In this regard, they claim that:  (1) WMS (rather than WMS-Maryland, which Riffin formed in May 2006) received Board authority to acquire and operate the Line; (2) this authority was based on the financial statements of the original investors; (3) WMS had an obligation to inform the Board that it was no longer financially responsible when investors backed out; and (4) the Board had a duty to declare WMS's OFA moot, as it did in Consol. Rail Corp.—Aban. Exemption—Hudson County, N.J. (Conrail—Hudson County), AB 167 (Sub-No. 1190X) (STB served May 17, 2010), when, according to Petitioners, WMS never acquired substitute financing.[51]

This argument erroneously conflates the issue of "title" with the issue of whether our OFA procedures have been followed.  OFA proceedings do not confer "title" to real property on entities.  Rather, they grant qualified entities the opportunity, under applicable state property law, to acquire property that is subject to an abandonment application.  Thus, nothing stated—or not stated—in the parties' filings in these dockets about the status of OFA qualification could be said to constitute a misrepresentation as to "title."

In any event, Petitioners' analogy to Conrail—Hudson County is not on point.  In that case, Riffin was pursuing an OFA, but suffered a financial setback as indicated by his filing for personal bankruptcy.  For reasons having nothing to do with Riffin's bankruptcy, the Board

---

[49]  Motion to Compel filed in AB 55 (Sub-No. 659X), Jan. 14, 2008, at 1, 5.

[50]  See Transcript of Ruling at 22 ("The old deed, to the extent it somewhere still exists in a drawer, that Mr. Riffin can't find, is void.  It appears it was likely issued in error in the first place and subject to corrective rights.  It is subordinate to the rights of the estate in bankruptcy and it is of no longer any effect.").

[51]  Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5-6; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 6.

13

exempted that line from the OFA process. But the Board noted that, even if an exemption were not appropriate, bankruptcy was incompatible with the requirement that a party filing an OFA be financially responsible. Here, contrary to Petitioners' claims, WMS *did* secure substitute financing—Riffin himself agreed to provide the required financing in exchange for a 98% interest in WMS.[52]

    <u>Authority of the Trustee.</u>  Petitioners next argue that "[i]t was a material misrepresentation for [Eighteen Thirty] to represent that Riffin's bankruptcy trustee could convey the common carrier obligation associated with the Line."[53]  However, Eighteen Thirty's notice did not state that the bankruptcy trustee could convey the common carrier obligation associated with the Line.[54]  The notice stated merely that "[t]he trustee asserts that the bankruptcy estate is the owner of the equitable interest in the Line and that the trustee has the power to dispose of the Line subject to approval from the bankruptcy court."[55]  Petitioners have not shown this statement to be false or misleading.

    Petitioners also argue that the Board must reject the Notices, which they allege represent that Riffin is a railroad, to remain consistent with the agency's earlier decision in <u>Riffin– Petition</u>.  There, the Board concluded that Riffin was not a rail carrier because he lacked legal title to the Line or any other "suitable legal interest" in the Line sufficient to enable him to conduct rail operations.  Petitioners assert that, unless the Board rejects the Notices, "the Board

---

    [52] <u>See</u> Riffin Comments filed in FD 35438, Nov. 3, 2010, at 6; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 9; Motion to Compel filed in AB 55 (Sub-No. 659X), Jan. 14, 2008, at 2.  Petitioners suggest that, although Riffin agreed to provide the necessary funds for the purchase of the Line from CSXT, this did not constitute substitute financing for WMS, because Riffin insisted as a condition that he obtain the right to be substituted in WMS's place as the acquirer.  Riffin Comments filed in FD 35438, Nov. 3, 2010, at 6.  This is a distinction without a difference.  Riffin paid the entire purchase price at a time when only WMS had Board permission to acquire the Line.  And by acquiring a 98% ownership interest in WMS, Riffin necessarily acquired the right to seek substitution.

    [53] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 5.

    [54] Indeed, the bankruptcy court, referring to the common carrier obligation, observed that "it's not something the trustee conveys directly.  The trustee and this Court doesn't [sic] have that unrestricted power to designate someone as a common carrier.  The rights are associated, and if the acquirer both acquires legal title to the property and is approved by the board as a responsible person for that line, then those facts apparently create the status and legal rights of a common carrier over that line, such status and rights never having been abandoned."  <u>Transcript of Ruling</u> at 17-18.

    [55] Notice of Exemption in FD 35438 at 5.

Docket No. FD 35438, <u>et al.</u>

would tacitly be admitting that Riffin does in fact have, and has had, the common carrier obligations associated with the Line."[56]

This is incorrect. Neither the Notices nor the trustee accepted Riffin's common carrier claim. As Respondents explain, the trustee stated that Riffin's bankruptcy estate had an <u>equitable</u> interest in the Line that allowed the trustee to designate the party to whom CSXT was to issue a replacement deed.[57] Thus, the trustee's claim, which was accepted by the bankruptcy court,[58] is consistent with the Board's determination in <u>Riffin—Petition</u>.

Petitioners next argue that the Notices must be rejected because the bankruptcy estate contained no property related to the Line. Specifically, they assert that,

> WMS L.L.C. has not filed for bankruptcy, that Riffin has conveyed 96% of his interest in the track material and right-of-way to other parties, prior to his filing for bankruptcy . . . that the only thing that is/was a part of Riffin's bankruptcy estate was the 4% interest Riffin retained in the track material and right-of-way . . . that the only thing that is in Riffin's bankruptcy estate is his 4% interest in WMS L.L.C., and thus the only thing that potentially can be conveyed by Riffin's Bankruptcy Trustee is Riffin's 4% interest in WMS LLC, **not** the **Line** or the "track and right of way" [and] that Riffin has exempted his 4% interest in WMS LLC, and thus Riffin's 4% interest **is no longer a part of Riffin's bankruptcy estate**.[59]

These claims over entitlement to, or interest in, any assets in Riffin's bankruptcy estate, however, are for the bankruptcy court to determine. As noted by Riffin in his Motion to Dismiss at 4, the Board's grant of acquisition and/or operation authority is permissive, and not mandatory; it neither determines ownership of, nor creates a real property interest in, a line.[60] Petitioners' disagreement with the trustee over the contents of the bankruptcy estate provides no basis for rejecting the Notices.

---

[56] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 5; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 5. This argument echoes that made by Riffin in his Motion to Dismiss. See <u>supra</u> note 36 and accompanying text.

[57] <u>See</u> Respondents Joint Reply of Nov. 17, 2010 at 15.

[58] <u>See</u> <u>supra</u> note 55.

[59] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 4; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 4-5.

[60] <u>See</u>, <u>e.g.</u>, <u>General Ry. Corp.—Acquis. Exemption—F&L Realty, Inc.</u>, FD 33905, slip op. at 6 (STB served Oct. 22, 2001); <u>MVC Transp., LLC—Exemption for Acquis. of R.R. Line—in Osceola & Dickinson Counties, Iowa</u>, FD 34867, slip op. at 4 (STB served June 15, 2007). A Board authorization, like other licenses issued by the Board, may be considered personal property of the licensee; it is not an interest in real property.

15

Add. 21

Docket No. FD 35438, et al.

Continuance in-control.  Petitioners contend that the notice in FD 35436 falsely claims that Smith and Altizer are the petitioners, arguing that Eighteen Thirty and Georges Creek "will be the carriers [and as a consequence,] should be the 'petitioners,' not Mssrs. Smith and Altizer."[61]  Additionally, Petitioners contend that the notice in FD 35436 falsely claims that the proposed continuance-in-control "is not part of a series of anticipated transactions that would connect the railroads with each other." 49 C.F.R. § 1180.2(d)(2).  They argue that: (1) Eighteen Thirty and Georges Creek must be connected if they are "to be common carriers on the same line of railroad"; and (2) Respondents are "anticipating" acquiring from CSXT a line that would connect the Line to a line Georges Creek currently operates in Luke, Md., a few miles away from the southern end of the Line.[62]

These contentions lack merit as well.  As the owners of Eighteen Thirty and Georges Creek, Smith and Altizer properly filed a notice of exemption from 49 U.S.C. § 11323 pursuant to 49 C.F.R. § 1180.2(d)(2) to continue in control of Eighteen Thirty and Georges Creek upon their becoming rail common carriers.  Eighteen Thirty and Georges Creek Railway, however, had no reason to seek a continuance-in-control exemption.  They were the entities to be controlled by Smith and Altizer and the proper parties to file for acquisition and operation exemptions under 49 C.F.R. § 1150.31.

Nor did the notice in FD 35436 misrepresent the relationship between Eighteen Thirty and Georges Creek, or otherwise make false claims in violation of the requirements for use of the class exemption, 49 C.F.R. § 1180.2(d)(2).  The class exemption is intended to prevent a short line railroad from acquiring a series of contiguous individual lines to create a "system" with significant competitive impacts without the greater regulatory scrutiny afforded by a formal application or an individual petition for exemption.  Here, Eighteen Thirty sought to acquire, and Georges Creek sought to operate, the same line—not connecting contiguous individual lines.

Similarly, the notice in FD 35436 did not misrepresent Respondents' anticipated actions. Respondents assert that they have no plans to extend their operations over the CSXT line that would connect the Line to the line in Luke, where Georges Creek performs "private, noncommon carrier plantsite switching service . . . for NewPage Corporation [and that Respondents] have no current plans to extend their operations over CSX[T]'s line . . . as CSX[T] has no plans to dispose of that line."[63]

Conflict of interest.  Petitioners contend that the Notices falsely claim that Respondents can be represented by their attorney, John Heffner.  According to Petitioners, Heffner may not represent Respondents here, because he represented WMS, WMS-Maryland, and Riffin previously in CSXT—Allegany County.  This poses a conflict of interest, Petitioners assert, because Respondents "have a desire to divest Riffin of his common carrier obligation in the Line

---

[61]  Riffin Comments filed in FD 35438, Nov. 3, 2010, at 2; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 2.

[62]  Id.

[63]  Respondents Joint Reply filed in FD 35438, Nov. 17, 2010, at 10.

16

Docket No. FD 35438, et al.

and to divest Riffin and the parties Riffin has contracted with, of his and their title and interest to the track material and right-of-way associated with the Line."[64]  Further, they claim that there is a high probability that Heffner will be called as a witness in Riffin's bankruptcy proceeding, where he could "invoke the attorney/client privilege to refuse to testify or respond to discovery requests [or] disclose privileged information to those parties, whose interests are adverse to Riffin's interests."[65]  Petitioners request that the Board order Heffner to cease representing Respondents in any matter relating to Riffin, WMS-Maryland, WMS, or the Line.

Respondents claim that: (1) Heffner has never represented WMS-Maryland, or Riffin; (2) Heffner has continuously represented Altizer going back to 2005 when Altizer initially tried to acquire the Line; (3) Altizer established WMS to acquire the Line; and (4) Altizer sold Riffin the 98% interest in WMS when part of the financing to acquire the Line fell through.  Further, Respondents assert that Heffner continued to represent Altizer and WMS, both in negotiations with CSXT and before the Board during this period.[66]  Acknowledging that Heffner filed the motion in 2006 to substitute Riffin for WMS as the purchaser of the Line, Respondents claim that Heffner "advised Mr. Riffin that he represented Mr. Altizer and not Mr. Riffin but that he would handle the substitution filing as a courtesy."[67]

We conclude that the Notices contain no materially false or misleading information concerning Heffner's ability to represent Respondents.  In this regard, the Notices represent, at most, that Heffner has Respondents' permission to represent them, which, as far as the record reveals, he did.[68]  The Notices state nothing about whether Heffner has a conflict of interest in

---

[64] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 7; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 7.  Contending that 96% of the track material and right-of-way belongs to Lowe and others, and that the remaining 4% belongs to Riffin and has been exempted from his bankruptcy estate, Petitioners assert that "[n]one of these parties have consented, nor will they consent, to the transfer of the underlying real estate and track material to Mssrs. Smith and Altizer without compensation, which Mssrs. Smith and Altizer have not offered."  RiffinMotion to Stay and to Revoke at 3; Lowe Motion to Stay and to Revoke at 3  The compensation Smith and Altizer paid to acquire the Line went to Riffin's bankruptcy estate.  This dispute is with the trustee and the bankruptcy court and is best left to them to resolve.  See also Transcript of Ruling at 20-21 ("Whatever interests others held in the rights of this line, as of the [bankruptcy] petition date, will attach to the proceeds of sale and must be determined within the framework of an adversary proceeding . . . .  There is such an adversary proceeding pending, and it's not before the Court for decision today.").

[65] Riffin Comments filed in FD 35438, Nov. 3, 2010, at 7; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 7-8.

[66] See Respondents Joint Reply filed in FD 35438, Nov. 17, 2010, at 16-17.

[67] Id. at 17.

[68] Cf. Arthur W. Single II—Continuance in Control Exemption—Charlotte S. R.R., FD 35253, slip op. at 2 (STB served Mar. 4, 2011) (rejecting notice of exemption because it "purports to be filed on behalf of a party who did not authorize, and indeed was not even aware of, its filing").

17

Docket No. FD 35438, et al.

representing Respondents, which is more in the nature of a legal interpretation, rather than a factual representation.

Although we find this argument for rejecting the Notices unpersuasive, Petitioners raise a valid representation issue. Under the Board's Canons of Ethics, a practitioner may not represent conflicting interests, except by express consent of all concerned, given after a full disclosure of the facts. See 49 C.F.R. § 1103.16(b). The problem here is not that the Respondents' interests conflict with each other, but rather that they conflict with the interests of Heffner's former client, WMS. The Canons of Ethics, at 49 C.F.R. § 1103.16(c), address conflicts that arise when the interests of a new client would conflict with those of a former client:

> The obligation to represent the client with undivided fidelity and not to divulge secrets or confidence forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

Here, § 1103.16(c) prohibits Heffner from continuing to represent Respondents in their efforts to acquire and operate the same line of railroad that his prior client, WMS, sought to acquire and operate. Although Respondents argue persuasively that Heffner did not represent Riffin or WMS-Maryland,[69] they concede that Heffner represented WMS.[70] Respondents offer no explanation for how Heffner could, consistent with the Board's rules, represent them in their effort to acquire and operate the Line after he had represented WMS, which also sought to acquire and operate the Line, and which was 98% owned by Riffin. It would serve no purpose to reject the Notices based on this finding, other than to penalize Respondents, who are guilty of no misstatement or other intentional violations of Board regulations.[71] However, we will direct Heffner to cease any further representation of Respondents before the Board on matters involving the Line.

Controversy. Finally, Petitioners argue that the Notices should be rejected because they are controversial and because the time constraints associated with the notice of exemption process, 49 C.F.R. § 1150.31, do not permit the development of a sufficient record in these

---

[69] We find no merit to Riffin's assertion that Heffner represented him or WMS-Maryland. While Heffner handled the June 14, 2006 substitution filing by WMS and Riffin in CSXT—Allegany County, Riffin was advised by Heffner that he represented Altizer, but would handle the substitution filing for Riffin as a courtesy. Heffner's account is corroborated by the substitution filing itself where Heffner identified himself as counsel only for "WMS, LLC a/k/a Western Maryland Services, L.L.C.," and not for Riffin.

[70] See Respondents Joint Reply filed in FD 35438 et al., Nov. 17, 2010, at 16 ("In exchange for a cash infusion, Mr. Altizer sold Mr. Riffin a 98% interest in [WMS]. The undersigned counsel [Heffner] continued to represent Mr. Altizer and [WMS] in negotiations with CSX and before the Board during this period.").

[71] Indeed, nothing in the record suggests that Respondents benefitted from any client confidences that WMS may have entrusted to Heffner.

18

Docket No. FD 35438, et al.

circumstances. The notice of exemption process is an expedited means of obtaining Board authority in certain classes of transactions, defined in the Board's regulations, that ordinarily do not require greater regulatory scrutiny. Notices of exemption are intended to be used for routine and non-controversial cases. Notices that contain unresolved issues or questions that require considerable scrutiny may be rejected.[72]

Here, however, Petitioners have not identified any reasonable basis for viewing the transactions pursuant to the bankruptcy process as controversial.[73] As explained above, Petitioners' opposition rests on their misreading of both the Notices and the Board's regulations. The mere fact that Petitioners found numerous ways to misread these materials does not establish the presence of issues that require "considerable scrutiny." Nor does their opposition to the Notices, without more, suffice to make the Notices controversial so as to require rejection.

In sum, because Petitioners have failed to demonstrate anything false, misleading, or controversial in or about the Notices, their motions to reject will be denied.

### 3. RESPONDENTS' UNAUTHORIZED PRACTICE OF LAW ALLEGATION

Respondents contend that, with respect to the filings submitted by Lowe, Riffin appears to be engaged in the unauthorized practice of law before the Board. They observe that "[t]he filings made under her [Lowe's] name appear to be more or less identical to those submitted by Mr. Riffin in both content and even typographical style and format."[74] In addition, Respondents point out that Riffin served both his and Lowe's pleadings on Respondents' counsel in an envelope that bears Riffin's return address and contains sufficient postage for both sets of pleadings.[75] Respondents request that the Board require Riffin to cease representing other parties, including Lowe, and to require Lowe to obtain independent representation if she wants to continue submitting filings.

Riffin responds that the Board in Norfolk Southern Ry.—Petition for Exemption—in Baltimore City & Baltimore County, Md., AB 290 (Sub-No. 311X) (STB served Mar. 22, 2010) (Norfolk Southern), objected to Lowe and others participating in that proceeding by "merely adopting by reference whatever Riffin pleaded [and i]nstead, mandated that these individuals

---

[72] See ABC & D Recycling, Inc.—Lease and Operation Exemption—A Line in Ware, Mass., FD 35397, slip op. at 4 (STB served Jan. 20, 2011); see also Ohio Valley R.R.—Acquis. & Operation Exemption—Harwood Props., Inc., FD 34486, slip op. at 4 (STB served Feb. 23, 2005) ("[W]e may reject a notice . . . if the transaction engenders substantial controversy.").

[73] Petitioners' argument is limited to the following statement: "Riffin will be involved in this proceeding. This proceeding will become (it has already become) highly controversial." Riffin Comments filed in FD 35438, Nov. 3, 2010, at 1; Lowe Comments filed in FD 35438, Nov. 3, 2010, at 1.

[74] Respondents Joint Reply filed in FD 35438 et al., Nov. 17, 2010, at 17.

[75] Id., Ex. C.

19

Docket No. FD 35438, <u>et al.</u>

prepare separate full-length pleadings, signed by each individual, which they did."[76] According to Riffin,

> [t]hese individuals have made it clear that they will be filing separate, but virtually identical pleadings with the Board, signed by each individual individually. Riffin has given Ms. Lowe [and others] permission to not only adopt verbatim whatever Riffin writes, but also to plagiarize whatever Riffin writes [, and that] Riffin does not advise these individuals what to write. He merely gives them an advance copy of what he has written.[77]

Lowe reiterates Riffin's contentions, asserting that she has "chosen to adopt, with Mr. Riffin's permission, virtually verbatim, what Mr. Riffin has scribed. This has been done for my convenience and efficiency."[78]

In <u>Norfolk Southern</u>, the Board granted a motion to strike the notices of intent to participate and to file an OFA that Riffin had filed on his own behalf and on behalf of Lowe and other named individuals. Referring to a previously issued protective order in the proceeding, the Board stated that: (1) "under 49 CFR 1103.2 and 1103.3, Riffin may only represent himself, as he is neither a licensed attorney nor practitioner approved to practice before the Board"; and (2) "under 49 CFR 1104(4)(b), a document not signed by a practitioner or attorney must be accompanied by the signer's address."[79] Here, Lowe's pleadings do not violate the filing requirements of § 1104(4)(b) as set forth in <u>Norfolk Southern</u>. Her pleadings are separate from Riffin's, and she has signed and verified them. Accordingly, we will deny Respondents' request that Riffin be ordered to cease representing other parties and that Lowe be required to obtain independent representation.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

<u>It is ordered</u>:

1. Allegany's motion for leave to intervene is granted.

2. Petitioners' replies of December 1, 2010, and Riffin's reply of January 11, 2011, are accepted into the record.

3. Respondents' and Allegany's requests that Riffin's motion to dismiss be rejected are denied.

---

[76] Riffin Reply, Dec. 1, 2010, at 2.

[77] <u>Id.</u> at 2-3.

[78] Lowe Reply, Dec. 1, 2010, at 2-3.

[79] <u>Norfolk Southern</u>, slip op. at 3.

20

Docket No. FD 35438, <u>et al.</u>

4.   Riffin's motion to dismiss the proceedings on jurisdictional grounds is denied.

5.   Petitioners' motions to reject the three Notices are denied.

6.   Petitioners' request that Heffner be ordered to cease representing Respondents in any matter relating to the Line is granted.

7.   Respondents' request that Riffin be ordered to cease representing Lowe and that Lowe be required to obtain independent representation is denied.

8.   This decision is effective on its service date.

By the Board, Chairman Elliott, Vice Chairman Mulvey, and Commissioner Begeman.

21

Add. 27

42039
DO

SERVICE DATE – LATE RELEASE NOVEMBER 23, 2011

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 35559

SARATOGA AND NORTH CREEK RAILWAY, LLC–
OPERATION EXEMPTION–TAHAWUS LINE

Decided: November 23, 2011

This decision rejects the notice of exemption filed in this proceeding.

On October 25, 2011, Saratoga and North Creek Railway, LLC (Saratoga), a Class III rail carrier, filed a verified notice of exemption under 49 U.S.C. § 10902 and 49 C.F.R. § 1150.41 to operate, as a line of railroad, approximately 29.71 miles of private track owned by NL Industries, Inc. (NL). Saratoga calls the private track the "Tahawus Line." The track runs between its existing connection with Saratoga at North Creek, N.Y., and its terminus at Newcomb, N.Y. The exemption is scheduled to become effective on November 24, 2011.

The notice indicates that Saratoga intends to restore rail service on the track by serving NL and other shippers. The notice also states that Saratoga plans to acquire the 29.71-miles of track before this notice is scheduled to become effective. Saratoga states that the subject track has never been operated in common carrier service and that, therefore, Saratoga does not need any Board authority to acquire it.

On November 14, 2011, Protect the Adirondacks! Inc. (Protect), a non-profit organization, filed a petition to reject Saratoga's notice of exemption.[1] In its petition, Protect argues that Saratoga's claim that it will provide common carrier service to NL is not credible. Protect also argues that the transfer and proposed operations represent an attempt to defeat other property interests and to subvert the acquisition of the land for a state forest preserve within Adirondack Park, a state park. The track at issue here lies within the park. In support of its argument, Protect notes that NL ceased mining operations in 1982, that the track would need rehabilitation in excess of $5 million in order to meet current safety standards, and that NL demolished most of its mill buildings in 2006. Protect also states that, other than a mine located near the southern end of the track that ships garnet stones via truck, there are no other potential customers on or near the track, and that Saratoga's primary intention is to operate a passenger tourist service over the entire 29.71 miles of track. In addition, Protect disputes NL's legal authority to allow Saratoga to acquire the track under NL's rail easement. Finally, Protect

---

[1] Although Protect describes its letter as a "protest," it will be considered a petition to reject the notice of exemption.

Docket No. FD 35559

contends that the proposed transaction requires environmental review under the Board's regulations implementing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332.

On November 22, 2011, Saratoga filed a reply to Protect's petition to reject the notice of exemption. Saratoga argues that Protect has not alleged any basis for the Board to reject the notice. Saratoga submits additional information regarding the legal status of the track and the current operational status of NL's mine. Saratoga argues that there are no restrictions on the easement for rail service over the right-of-way. Saratoga also states that the State of New York's Department of Transportation, in a letter dated September 19, 2011, has waived its statutory right to exercise its reversionary interest and reacquire the underlying property. Furthermore, Saratoga states that it has conducted initial discussions for transporting via rail both the industrial garnets from nearby Barton Mines and the magnetite ore reserves located and processed at NL's mine. Both Barton and NL currently ship via truck. Saratoga also states that the acquisition does not trigger environmental review under NEPA. Finally, Saratoga's reply submission contains conflicting statements regarding its intentions for passenger excursion operations on the line.[2]

Typically, the Board does not consider the feasibility of proposed rail operations in giving effect to a notice invoking the class exemption. The Board's authority is permissive, so the possibility always exists that the party filing the notice may be unable to initiate the proposed operations. But where an allegation is made, supported by evidence, that the exemption sought is for purposes other than for providing common carrier rail service, the Board will not allow the exemption to go forward without considering that evidence and argument. Although Saratoga states that it has engaged in discussions with 2 shippers about potential freight rail service, both customers currently ship their products via truck. Furthermore, although Saratoga's notice of exemption made no mention of potential passenger service, its reply contains statements that such operations will commence in the very near future.

In general, the notice of exemption process is an expedited means of obtaining Board authority in certain classes of transactions, defined in the Board's regulations, which ordinarily do not require extensive regulatory scrutiny. Thus, notices of exemption are intended to be used for routine and non-controversial cases. In cases where issues arise that cannot be resolved within the limited procedures afforded by the class exemption, the Board may reject a notice.

---

[2] Compare Saratoga Reply at 10 ("While Saratoga might elect to operate excursion service at some point, it has no immediate plans to do so."), with V.S. of Stephen Gregory at ¶4 ("[O]ur vision to develop the . . . rail asset was twofold: initial deployment of resources to immediately provide passenger-train service to be followed by freight traffic development."), and Letter of L. Andrew Fleck at ¶5 ("NL has agreed to provide Saratoga with reasonable and appropriate site access at the northern terminus of the rail line for passenger accommodation."). Not all passenger service is within the Board's jurisdiction.

2

Docket No. FD 35559

Saratoga's notice of exemption will be rejected because the record indicates that this matter is not routine and non-controversial and because the short deadlines provided in the class exemption regulations do not provide sufficient time to enable the Board to address the issues raised here before the exemption takes effect. To allow a proper examination of all the concerns discussed above, Saratoga may file a petition for an individual exemption or a full application.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

<u>It is ordered</u>:

1. Saratoga's notice of exemption is rejected.

2. The decision is effective on the date of service.

By the Board, Julia M. Farr, Acting Director, Office of Proceedings.

3

Add. 30

42177
EB

SERVICE DATE – MAY 14, 2012

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 35559

SARATOGA AND NORTH CREEK RAILWAY, LLC–
OPERATION EXEMPTION–TAHAWUS LINE

<u>Digest</u>:[1]  In this decision the Board denies a railroad's appeal of an earlier decision by the Acting Director of the Office of Proceedings rejecting the railroad's notice under the class exemption at 49 C.F.R. § 1150.41 for authority to operate as a common carrier over a private rail track in upstate New York. The Board finds that the Acting Director acted properly in rejecting the notice given the issues that were raised.  However, subsequent filings have provided enough information to resolve the concerns that led to the Director's decision.  Thus, the railroad may now file a new notice of exemption for the operating authority it seeks.

Decided:  May 10, 2012

Invoking the statutory authority of 49 U.S.C. § 10902 and the Board's regulations at 49 C.F.R. § 1150.41, Saratoga and North Creek Railway, LLC (Saratoga), a Class III rail carrier, filed a verified notice of exemption under the expedited class exemption process at 49 C.F.R. § 1150.41-44, regulations designed for routine and non-controversial cases that ordinarily do not require extensive regulatory scrutiny.  Saratoga sought authority to operate, as a line of railroad, approximately 29.71miles of private track previously owned by NL Industries, Inc. (NL), which Saratoga refers to as the "Tahawus Line."[2]  The notice of exemption was served and published in the <u>Federal Register</u> on November 10, 2011.  The Acting Director of the Office of Proceedings (Director), in a decision served November 23, 2011 (November Decision), rejected the notice of exemption before it became effective.  Saratoga appeals that decision to the full Board.

In this decision, we find that the Director properly rejected Saratoga's notice of exemption and, accordingly, we deny Saratoga's appeal of that decision.  Saratoga's original notice, as well as its initial reply to a letter submitted by Protect the Adirondacks! (Protect), left

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the convenience of the reader.  It may not be cited to or relied upon as precedent.  <u>Policy Statement on Plain Language Digests in Decisions</u>, EP 696 (STB served Sept. 2, 2010).

[2]  Saratoga states that the subject track has never been operated in common carrier service and that, therefore, Saratoga does not need any Board authority to acquire it.

Add. 31

Docket No. FD 35559

unanswered certain questions pertaining to the future use of the Tahawus Line and the need for freight service. The Director, unable to reconcile the concerns raised in the filings made to the Board before the exemption took effect, determined that the Board's class exemption procedures were an ill-suited process to resolve those questions, which would be necessary to provide the operating authority Saratoga sought. The November Decision did not decide whether common carrier operations on the Tahawus Line ultimately should be allowed. Rather, it held that use of the limited procedures afforded by the class exemption was not appropriate, given the information in the record at that time.

Subsequent filings have clarified the record. Saratoga's appeal, the reply of Protect, and the additional letters of concern and support have provided significant additional information regarding such issues as passenger rail service and the potential for serving shippers on the Tahawus Line. It is now clear that Saratoga has no present plan to pursue passenger rail service, and that there are shippers in need of freight rail service. Based on all of the information now available, we are satisfied that Saratoga's proposal would qualify for the class exemption. Therefore, Saratoga need not file a petition for individual exemption or a full application. Saratoga may file a new notice of exemption, including a new filing fee, for authority to pursue common carrier service on the Tahawus Line.

## BACKGROUND

The Tahawus Line is a 29.71-mile private track located in upstate New York. The U.S. Government, during World War II, used its eminent domain power to create a right-of-way for trackage traversing the Adirondack State Forest Preserve, in order to facilitate the transportation of ilmenite ore from a mine owned by NL. After construction was completed, the Federal government leased the trackage to NL. NL contracted with the Delaware & Hudson Railroad (D&H), the predecessor to the Canadian Pacific Railway Company (CP), to ship ore via the Tahawus Line. Following the end of World War II, NL continued to transport ilmenite ore from its mine over the Tahawus Line. The easements had been set to expire 15 years after the end of the war.[3] In 1962, however, the General Services Administration (GSA) instituted another eminent domain proceeding and extended the term of the easements for 100 years, until 2062. NL discontinued shipping its ore by rail in the 1980s, but continued to ship minerals from the mine via truck. In 1989, GSA auctioned the Tahawus Line, and NL acquired it as private track.

On October 25, 2011, Saratoga filed a notice of exemption to operate on the Tahawus Line as a common carrier. Saratoga cited an agreement with NL to acquire the Tahawus Line and initiate common carrier service over the trackage. Saratoga stated that it anticipated consummating the acquisition of the private track prior to the effective date of the notice, because the acquisition did not require Board authority. Saratoga indicated that the Tahawus

---

[3] President Truman declared the end of World War II in 1952, so the easements were to expire in 1967.

2

Add. 32

Docket No. FD 35559

Line connects at North Creek to another line where Saratoga has recently restored common carrier service. This line continues south to its terminus in Saratoga Springs, where Saratoga can interchange traffic with CP.

In the November Decision, the Director rejected Saratoga's notice of exemption. As previously noted, the November Decision correctly stated that notices of exemption are intended to be used for routine and non-controversial cases, and that in cases where issues arise that cannot be resolved within the limited procedures afforded under the class exemption process, the Board may reject the notice.

In its appeal of the Director's decision to the full Board, Saratoga argues that the November Decision reflects a clear error of judgment by the Director, because the rejection of its notice of exemption allegedly was based solely on the protest filed by Protect. Saratoga argues that Protect failed to cite any legal basis for rejecting the notice and did not meet its burden of proof. Furthermore, Saratoga claims that the November Decision does not address the Board's standards for rejection, was contrary to agency precedent, and cited as facts information contrary to the evidentiary record. In reply, Protect argues that the Director properly rejected the notice.

In addition, several other interested parties filed letters in response to Saratoga's appeal. NL submitted an additional letter of support on December 5, 2011. NL's letter clarifies the scope of its operations at its mine in the Town of Newcomb, and states that it is actively pursuing negotiations with Saratoga to divert its truck traffic to rail. NL also states that it has spent in excess of $4 million on environmental site remediation required by the State of New York to complete its remedial obligations. NL also notes that its remediation actions have not limited the uses to which its property can be put.

The New York State Department of Environmental Conservation (NYSDEC) filed a letter on December 21, 2011, stating that the Tahawus Line traverses over 13 miles, and 220 acres, of state-owned and constitutionally protected Adirondack Forest Preserve, which is under its jurisdiction. NYSDEC noted that there remained many unresolved legal issues concerning the status of the Tahawus Line, the easement on which it is located, and the potential future use of the right-of-way. On March 19, 2012, however, NYSDEC and the New York State Department of Transportation (NYSDOT) filed a letter urging the Board to grant Saratoga's appeal and enclosed a copy of correspondence from Saratoga to NYSDEC dated March 8, 2012. NYSDEC and NYSDOT state that Saratoga's letter addresses their concerns regarding snowmobile use and trail use, as well as the economic and environmental impacts that would be associated with rail operations.[4]

---

[4] Letters or resolutions of support for Saratoga's appeal were also filed by the Town of Newcomb, the North Country Chamber of Commerce, the Essex County Board of Supervisors, New York State Senator Elizabeth Little, New York State Assemblywoman Teresa R. Sayward, the Town of Queensbury, N.Y., the Hamilton County Board of Supervisors, the Town of Indian

(continued . . .)

3

Add. 33

Docket No. FD 35559

The Friends of the Upper Hudson Rail Trail (Upper Hudson) filed a letter on January 13, 2012, expressing concerns that the Tahawus Line would not be eligible for future use as a recreational trail under 16 U.S.C. § 1247(d).  Upper Hudson neither supports nor opposes Saratoga's appeal.  Upper Hudson is concerned that the right-of-way will revert to the underlying landowners in 2062, thus rendering abandonment of the Tahawus Line inevitable.  It challenges the assertion in the November Decision that the Tahawus Line is now private track, asserting that the track was under the jurisdiction of the Board prior to Saratoga's purchase because it was constructed and owned by the Federal government, and was once operated upon by a common carrier (D&H), and used to move goods across state lines.  Saratoga, on January 19, 2012, filed a request for leave to respond to Upper Hudson's comments.  Saratoga states that the acquisition of the Tahawus Line is exempt from the Board's acquisition jurisdiction because it was private track owned by a shipper, even though a common carrier railroad once provided service over it.  Furthermore, Saratoga states that the Tahawus Line cannot currently be considered for railbanking and interim trail use under 16 U.S.C. § 1247(d) because it has not been the subject of an abandonment proceeding before the Board.  Finally, Saratoga states that, should its effort to obtain an operation exemption from the Board be successful, the Tahawus Line would become a regulated line of railroad subject the Board's jurisdiction, so that interim trail use could potentially occur if and when a future request for abandonment authority is sought.

PRELIMINARY MATTER

On January 4, 2012, Protect filed a motion pursuant to 49 C.F.R. § 1011.2(a)(7) for leave to late file its reply to Saratoga's appeal of the November Decision.  Protect filed its reply with the Board on December 27, 2011.  As pointed out by Saratoga in a letter filed on December 22, 2011, the deadline for replies was December 15, 2011.  In support of its motion, Protect states

---

(continued . . .)
Lake, N.Y., and the Adirondack Park Local Government Review Board.  Saratoga also submitted filings to inform the Board of local community support for Saratoga's proposed operations, including the Warren County Board of Supervisors, the North Country Regional Economic Council, letters and emails of support from individuals in the local community, the letter of support of Victoria Pratt Gerdino, President of EDC Warren County, the Town of Edinburg, N.Y., and the InterCounty Legislative Committee of the Adirondacks.  On March 16, 2012, Saratoga filed a letter referencing a letter of support to be filed by United States Senator Kirsten E. Gillibrand and a joint letter of support to be filed by NYSDOT and NYSDEC.  On March 26, 2012, the Board received the letter of support from Senator Gillibrand stating that Saratoga's request for authority is in keeping with New York's North Country Regional Economic Development Plan.  On April 30, 2012, United States Senator Charles E. Schumer filed a letter of support stating that Saratoga's request to commence common carrier operations on the Tahawus Line would reduce unwanted truck traffic through New York's Adirondack Park and would support much needed economic development and jobs in the Adirondack Region.

4

Add. 34

Docket No. FD 35559

that it contacted the Board's Office of Public Assistance, Governmental Affairs, and Compliance (OPAGAC) regarding the process for responding to Saratoga's appeal and was incorrectly informed that it had 20 days to file, rather than 10. Protect also states that its late filing did not prejudice Saratoga.

Good cause exists to grant the motion. Protect engaged in a good faith effort to comply with the Board's rules, and Saratoga is not prejudiced by the late filing of the reply. Protect's reply will be accepted and considered for the purposes of this decision.

DISCUSSION AND CONCLUSIONS

Under 49 C.F.R. § 1011.7(a)(2)(x)(A), the Board has delegated to the Director the authority to initially determine whether to issue notices of exemption under 49 U.S.C. § 10502 for operation transactions under 49 U.S.C. § 10902. The Board has reserved for itself the consideration and disposition of all appeals of initial decisions issued by the Director. See 49 C.F.R. § 1011.2(a)(7). On appeal, the Board considers whether the Director properly rejected the notice of exemption. Under 49 C.F.R. § 1115.1, an appeal of the Director's decision is not favored and will be granted only in exceptional circumstances to correct a clear error of judgment or to prevent manifest injustice. A successful appeal must satisfy one or more of the following criteria: (1) a necessary finding of fact is omitted, erroneous, or unsupported by the substantial evidence of record; (2) a necessary legal conclusion or finding is contrary to law, Board precedent, or policy; (3) an important question of law, policy, or discretion is involved which is without governing precedent; or (4) a prejudicial procedural error has occurred. See 49 C.F.R. § 1115.2(b)(2). Here, Saratoga argues that the Director materially erred in rejecting the notice of exemption.

The Board's class exemption procedures provide an expedited means of obtaining Board authority in certain classes of transactions involving routine matters. A notice that raises unresolved issues or questions that require considerable scrutiny may be rejected. Winamac S. Ry.—Trackage Rights Exemption—A. & R. Line, Inc., FD 35208, slip op. at 2 (STB served Jan. 9, 2009). The Board's class exemption procedures are not intended for use in matters that attract substantial controversy and local interest. Ne. Interchange Ry.—Lease & Operation Exemption—Line in Croton-on-Hudson, N.Y., FD 34734, slip op. at 4 (STB served Nov. 18, 2005); ABC & D Recycling, Inc.—Lease and Operation Exemption—A Line of Railroad in Ware, Mass., FD 35397 (STB served Jan. 20, 2011). Saratoga's notice of exemption and the information that was filed in response to it raised questions that required scrutiny beyond the short deadlines and limited procedures afforded by the Board's class exemption procedures. Therefore, the Board will affirm the Director's decision to reject it.

Saratoga challenges the Director's decision on four grounds. First, Saratoga argues that the November Decision reflects a clear error of judgment in that Protect's protest letter did not request or cite a legal basis or rejection, and that Protect did not meet its burden of proof. Second, Saratoga argues that the November Decision did not address the Board's standard for

5

Add. 35

Docket No. FD 35559

rejection. Third, Saratoga argues that the November Decision was contrary to Board precedent. Finally, Saratoga argues that the November Decision did not accurately reflect the evidence of record. In particular, Saratoga argues that the Director misinterpreted statements in the record concerning passenger service. Each of Saratoga's arguments lacks merit.

First, the Director did not commit material error by treating Protect's protest letter as a petition to reject. Although Protect's letter was not styled as a petition to reject, the protest letter brought serious issues regarding the proposal to the Board's attention. Even if no petition to reject is filed, the Board may, in the public interest, act <u>sua sponte</u> to reject a notice of exemption. <u>See Borealis Infrastructure Mgmt., Inc., Sole Trustee of the Borealis Transp. Infrastructure Trust–Acquis. Exemption–Detroit River Tunnel Co.</u>, FD 33984, <u>et al.</u> (STB served Dec. 19, 2001). While the Director accepted Protect's letter and considered the assertions contained therein, the Director did not shift the burden of proof to Saratoga. Rather, Protect's protest letter, in combination with the factual inconsistencies in Saratoga's filings, reasonably led to a determination that the notice of exemption should be rejected.

Second, the November Decision addressed the standards for rejection, and the Director properly applied them. In determining whether to reject a notice, the Board considers whether the notice raises substantial controversy or substantial factual and legal issues. <u>S. San Luis Valley R.R.—Acquis. & Operation Exemption—Iowa Pac. Holdings, LLC</u>, FD 35586, <u>et al.</u> (STB served Feb. 10, 2012) (based on unresolved issues regarding prior acquisitions of the rail line, the Board rejected a notice of exemption, without any opposition or petitions to reject). Saratoga argues that there is nothing controversial about its proposal, but the Director's concerns regarding passenger service and whether the exemption sought was really for freight rail service were reasonable based on the information available at that time. Saratoga argues that its reply to the protest letter answered any concerns that might have been triggered by Protect. However, Saratoga's statements in the record concerning passenger service available to the Director at the time of the November Decision were not consistent. Because of these unresolved issues and the limited time afforded by the class exemption regulations, the Director properly rejected the notice.

Third, the November Decision is consistent with Board precedent. Saratoga cites to acquisition cases with greater opposition from shippers, state and local agencies, and environmental groups, which were approved by the Board and its predecessor, the Interstate Commerce Commission, to bolster its argument that the Director erred in rejecting its notice based on the lone protest of Protect.[5] Each transaction requires the Director to make a fact-specific determination based on the evidence available in the record. Moreover, as stated above, the Board may reject a notice <u>sua sponte</u>, and could reject a notice of exemption without any opposition from shippers, government agencies, or environmental groups, so long as doing so would be in the public interest.

---

[5] Saratoga Appeal at 12-13.

6

Add. 36

Finally, the Director properly evaluated the evidence regarding Saratoga's intentions to provide passenger service in deciding to reject the notice of exemption. Saratoga now explains that the comments in the Verified Statement of Stephen Gregory regarding passenger service referred to a different line, not the Tahawus Line. But the statement of Mr. Gregory at the time did not clearly identify the line on which Saratoga intended to provide passenger service. Saratoga also asserts that a statement by NL regarding passenger service on the Tahawus Line, referred to in the November Decision, was speculative and did not bind Saratoga. NL's statement, in addition to Protect's assertions regarding passenger service, demonstrate that the Director did not err in concluding that the record contained conflicting statements. In short, in rejecting the notice of exemption the Director evaluated the limited information available and correctly determined that the class exemption procedures were insufficient to address the concerns regarding potential freight rail and passenger operations.

While we find that, in the November Decision, the Director properly determined that Saratoga's notice of exemption presented issues that could not be adequately decided under the limited class exemption procedures, Saratoga and others have now provided adequate information for the Board to determine that use of the class exemption to operate over the Tahawus Line would be appropriate. Although Protect and Upper Hudson are free to continue to oppose this transaction, we will permit Saratoga to file a new notice of exemption. Protect raises arguments related to state property law that are not within the Board's jurisdiction, but instead are appropriate for a state court to address. See Allegheny Valley R.R. Co.—Petition for Declaratory Order—William Fiore, FD 35388, slip op. at 3 (STB served Apr. 25, 2011). The Board's class exemption authority is permissive, and is, therefore, not dispositive of any litigation pertaining to state law property interests for a railroad right-of-way. Protect has proffered neither additional evidence pertaining to any plans for Saratoga to operate passenger service, nor given the Board any reason to doubt the currently-expressed interest of Saratoga in serving NL or Barton Mines, once it is able to commence common carrier operations on the Tahawus Line.

To the extent Upper Hudson is concerned about interim trail use, the Tahawus Line is currently private trackage, and, therefore, not eligible for trail use under 16 U.S.C. § 1247(d). Although Upper Hudson challenges Saratoga's assertion that the Tahawus Line was non-jurisdictional private trackage when it was sold to NL, there is no evidence in the record that anyone received authority from the Board's predecessor, the Interstate Commerce Commission (ICC), to operate over the Tahawus Line as a common carrier. The U.S. Government may own a rail line without operating it as a common carrier. See Camp Lejeune R.R. Co.—Aban. Exemption—In Onslow Co., N.C., AB 290 (209X) (STB served Feb. 2, 2001). Furthermore, the owner of a private track may arrange for a contractor to conduct operations over the track to serve the owner, so that there is no "holding out" to serve other shippers. Such operations are not subject to the Board's jurisdiction. See B. Willis, C.P.A., Inc.—Petition for Declaratory Order, FD 34103, slip op. at 2-3 (STB served Oct. 3, 2001). Finally, a common carrier operating over private track would not fall under § 10901 (formerly 49 U.S.C. § 1(18)) with respect to

7

Add. 37

Docket No. FD 35559

those operations, so long as it does not perform common carrier service on the private track.  See New York Central R. Co. v. Southern Ry. Co., 226 F.Supp. 463, 471 (ND Ill., ED, 1964), aff'd 338 F.2d 667 (7th Cir. 1964), cert. denied 380 U.S. 914 (1965).

Saratoga has purchased the Tahawus Line from NL.  Should Saratoga acquire the authority to operate the Tahawus Line as a common carrier pursuant to its new notice of exemption, and exercise that authority, then the Tahawus Line will become a part of the national rail network.  Later, should Saratoga, at some point in the future, seek to abandon the Tahawus Line, then it would need authority from the Board to do so.  At that point, the Board's rules pertaining to railbanking and interim trail use would  apply, and interested parties, like Upper Hudson, could seek a trail condition and potentially enter into negotiations with Saratoga under 16 U.S.C. § 1247(d) and the Board's implementing regulations.

Finally, it has been suggested that, prior to authorizing Saratoga to operate over the Tahawus Line, an environmental review under the National Environmental Policy Act (NEPA) would be required.  On the other hand, Saratoga has contended that an environmental review is not necessary here.  Based on the information that is currently available, we do not expect that a NEPA review would be warranted if a new notice of exemption is filed.  Under the Board's environmental rules, requests for new operational authority on a rail line typically are excluded from NEPA review unless they trigger certain thresholds (generally an increase of 3 or 8 trains per day depending on whether the area is in attainment under the Clean Air Act).  See 49 C.F.R. §§ 1105.6(c)(2)(i), 1105.7(e)(4), and (5); see also Mo. Cent. R.R. Co.—Acquis. & Oper. Exemption—Lines of Union Pac. R.R. Co., FD 35508, et al., aff'd Lee's Summit, Mo. v. STB, 231 F.3d 39 (D.C. Cir. 2000).  Here, Saratoga asserted in its notice of exemption that the operating changes will not exceed these thresholds, but failed to provide information on the number of trains that it plans to operate on the Tahawus Line for the foreseeable future.  Given that environmental concerns have been raised about this proposal, Saratoga should specify the number of trains that it plans to operate in any new notice of exemption it files.

In sum, Saratoga has not persuaded us that the Director's decision involved material error.  However, Saratoga's evidence submitted on appeal and the other information that has been provided has clarified the concerns initially raised by the Director in the November Decision.  Therefore, if Saratoga wishes to seek operation authority from the Board with respect to the Tahawus Line, it may file a new notice of exemption under a new docket number with the appropriate filing fee.  Saratoga's notice also should specify the number of trains that it plans to operate on the Tahawus Line for the reasonably foreseeable future.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1.  Saratoga's appeal is denied.

8

Add. 38

Docket No. FD 35559

2.  Protect's motion for leave to late file its reply is granted.

3.  Saratoga's request for leave to respond to the comments of Upper Hudson is granted.

4.  This decision is effective on its service date.

By the Board, Chairman Elliott, Vice Chairman Mulvey, and Commissioner Begeman.

9

Add. 39